IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | | |
|---|---|---|
| STUDENT A, STUDENT B, STUDENT C, and STUDENT D, individually and on behalf of all others similarly, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 6:20-cv-00023-NKM |
| LIBERTY UNIVERSITY, INC., d/b/a/ LIBERTY UNIVERSITY, | ) ) ) ) | |
| Defendant. | ) | |

**LIBERTY UNIVERSITY'S REPLY IN SUPPORT OF ITS
MOTION TO STRIKE OR, IN THE ALTERNATIVE,
MOTION FOR A MORE DEFINITE STATEMENT**

Defendant Liberty University, Inc., d/b/a Liberty University ("Liberty" or the "University"), by counsel, and pursuant to Rules 10(a), 12(f), and 12(e) of the Federal Rules of Civil Procedure, states as follows for its Reply in support of its Motion to Strike or, in the alternative, Motion for a More Definite Statement (ECF No. 19):

## I. INTRODUCTION

Anonymous Students A, B, C, and D have attempted to transform a straight-forward contract dispute into a forum for political grandstanding. In an effort to distract from the fact that they suffered no compensable damage as a result of Liberty's response to COVID-19 during the Spring 2020 semester, Plaintiffs' First Amended Class Action Complaint ("Amended Complaint") cloaks straight-forward breach of contract claims with irrelevant and inflammatory newspaper accounts and social media posts. Plaintiffs' Amended Complaint reads less like a lawsuit and more like a public relations assault.

Plaintiffs follow a similar strategy in opposing Liberty's motion seeking to "unmask" the individual Plaintiffs. Rather than address the procedural and substantive deficiencies accompanying their unsanctioned use of pseudonyms, Plaintiffs have buried the lead by compiling op-eds and declarations from former students and faculty—none of whom is a party to this case—berating Liberty's leadership for the purported "culture of fear" that "dominates campus life." Plaintiffs vehemently criticize Liberty's alleged censorship and "silencing" of students, all while shining a negative spotlight on Liberty's response to Coronavirus in a very public forum. Plaintiffs have cloaked themselves with pseudonyms and secrecy, without permission from the Court and without overcoming the constitutionally-embedded presumption of *openness* in judicial proceedings. The irony is palpable. In addition to improperly concealing their identities from the public, Plaintiffs wish to remain anonymous to *Liberty* for the entirety of this litigation. Even in cases authorizing pseudonymous pleading, the identities of the unnamed parties typically are disclosed to their adversary. There is no authority compelling Liberty to defend itself against civil claims by nameless, faceless, alleged students. Contrary to Plaintiffs' assertion that Liberty need not *ever* know their identities because damages boil down to "an exercise in mathematics," Plaintiffs must reveal themselves to prove that they suffered actual harm and have standing to sue before calculating any alleged damages. Moreover, their identities are essential for discerning whether Plaintiffs can properly represent any class, as well as the type of students they could potentially represent.

Because Plaintiffs fail to establish extraordinary circumstances justifying anonymity, the Court should grant Liberty's Motion and strike all allegations from the Amended Complaint or, in the alternative, require Plaintiffs to make a more definite statement.

## II.     ARGUMENT

**1.   The Court Should Strike All Allegations from the Amended Complaint Because Plaintiffs' Use of Pseudonyms is Procedurally and Substantively Improper.**

Plaintiffs do not address the fact that they have repeatedly violated Rule 10(a) by filing a Complaint and Amended Complaint that fails to *name* all parties to this action in the title. Fed. R. Civ. P. 10(a). Nor do Plaintiffs provide *any* justification for proceeding anonymously without seeking permission from the Court. In addition to these procedural errors, Plaintiffs cannot rebut the presumption of openness in judicial proceedings and fail to allege or even argue the type of extraordinary circumstances that might persuade the Court to allow the use pseudonyms. The factors set forth in *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir.1993), clearly weigh *against* anonymity.

**Privacy interests.** Plaintiffs' choice to attend Liberty "for their own personal, family, and religious reasons" does not give rise to a special privacy interest weighing in favor of anonymity. (Pls.' Resp. in Opp'n to Def.'s Mot. to Strike (ECF No. 31) ("Pls.' Resp.") at 5.) This is a basic breach of contract case that does not implicate any privacy interests (such as a party's sexual history or highly confidential medical information). Plaintiffs' emphasis on President Falwell's Twitter following, as well as their worry that they will garner disapproval "for choosing to attend Liberty in the first place," (Pls.' Resp. at 4-5), highlights their desire to avoid mere "annoyance and criticism that may attend any litigation," *James*, 6 F.3d at 238. In contrast to students accused of sexual misconduct, domestic violence, and abusive behavior in dating relationships, a student's choice to attend Liberty does not constitute the type of "sensitive and highly personal [information]" that would justify the unusual use of anonymity. *Doe v. Virginia Polytechnic Inst. & State Univ.*, 2020 WL 1287960, at *3 (W.D. Va. Mar. 18, 2020); *Doe v. Alger*, 317 F.R.D. 37, 40 (W.D. Va. 2016). Indeed, a person's choice of school and educational background is the type

of information readily shared with the public on personal and professional social media sites, such as Facebook, Twitter, and LinkedIn. (*See, e.g.*, Ex. 2 to Pls.' Resp., Decl. of Calum Best (ECF No. 31-2) (hereinafter "Best Decl.") ¶ 12; Ex. A to Best Decl.)

Plaintiffs' suggestion that stripping their anonymity may attract attacks on their religious beliefs also lacks merit. (Pls.' Resp. at 5.) Attending a Christian university that does not require its applicants or students to declare a faith says nothing about a student's religion. Moreover, Plaintiffs' religion has no bearing on this case. *Cf. Doe v. Pittsylvania Cty., Va.*, 844 F. Supp. 2d 724, 729 (W.D. Va. 2012) (finding that first factor favored anonymity because religion "lie[d] at the heart of [the] case" and prosecuting the case would require plaintiff to reveal her "beliefs concerning the proper interaction between government and religion"). Unlike the Establishment Clause challenge at issue in *Pittsylvania County*, Liberty's defense will not probe into Plaintiffs' personal beliefs "concerning the proper interaction between government and religion." *Id.* Rather, Liberty seeks to learn Plaintiffs' identities in order to understand the terms of the parties' contracts and ascertain what, if any, fees Plaintiffs actually paid for the Spring 2020 semester. Accordingly, the first factor weighs *against* anonymity.

**Risk of Retaliatory Harm.** None of the claims, opinions, or hearsay set forth in the declarations and articles attached to Plaintiffs' response establishes a risk of retaliatory harm sufficient to warrant anonymity. First, recent graduate and self-proclaimed "outspoken critic" of Liberty's response to COVID-19, Calum Best ("Best"), points to mere chiding and criticism from Liberty's Senior Vice President for University Communications, Scott Lamb ("Lamb"), to support Plaintiffs' anonymity. (Best Decl. ¶¶ 1-2, 10-12, 21.) Lamb called Best and his employer to discuss Best's public Facebook post advocating for Liberty to issue refunds after the University transitioned courses online in March 2020. (*Id.* ¶¶ 12-13.) Best alleges that Lamb "lectured,"

"chided," and tried to bully him into not speaking out against Liberty. (*Id.*) In response to the call, Best penned an article for an online publication, *Medium*, criticizing Lamb and continuing to advocate for refunds. (*Id.* ¶¶ 14-15, Ex. C to Best Decl.)

Best recalls "several people in the Liberty University community" yelling at him and criticizing him before he published the article, and he claimed that the criticism "frightened" him and left him "trembling in fear." (Best Decl. ¶ 21.) Despite his purported trepidations, Best obviously felt sufficiently secure to publish the article and in turn suffered no adverse consequence. Liberty did not remove Best from his position as Chief of Staff for the Student Government's executive branch, and Best does not identify any public criticism from Liberty's leadership after he published the article. Nor did Liberty suspend or expel Best, who graduated in the Spring of 2020. (*Id.* ¶¶ 1, 4.) The fact that an "outspoken critic" of Liberty's response to COVID-19, (*id.* ¶ 2), experienced nothing more than alleged chiding and criticism aptly demonstrates the lack of support for Plaintiffs' fear of retaliation.

Next, former Liberty professor, Marybeth Baggett ("Baggett"), complains that President Falwell criticized her on Twitter after she published an op-ed condemning President Falwell's handling of Liberty's COVID-19 response. (Ex. 3 to Pls.' Resp., Decl. of Marybeth Baggett (ECF No. 31-7) (hereinafter "M. Baggett Decl.") ¶¶ 19-21.) When Baggett informed Lamb about her article and an interview with a local newspaper, Lamb sent an email to the Executive Vice President for Human Resources and Provost stating that Baggett was in breach of her contract with the University. (*Id.*). But Baggett, like Best, did *not* lose her job for criticizing Liberty's response to COVID-19. Rather, Baggett voluntarily left Liberty at the end of the 2020 academic year to teach at another school. (*Id.* ¶ 2.) Baggett's husband, another former Liberty professor, speculates that the University did not allow him to teach his newly conceived online course on Mister Rogers

5

because he expressed concerns about COVID-19 and in-person instruction. (Ex. 4 to Pls.' Resp., Decl. of David Baggett (ECF No. 31-8) (hereinafter "D. Baggett Decl." ¶¶ 6-7.) Baggett's husband also voluntarily left Liberty to teach at another university. (*Id.* ¶ 2.)

Neither Best's nor the Baggetts' declarations establish a risk of retaliatory harm against Plaintiffs. Third-party declarations generally constitute "weak evidence for pseudonymous litigation." *See Qualls v. Rumsfeld*, 228 F.R.D. 8, 11 (D.D.C. 2005). The plaintiff soldiers in *Qualls* challenged involuntary extensions under their enlistment contracts with the Army and sought to proceed anonymously. *Id.* at 9. The court rejected the plaintiffs' reliance on unrelated third-party declarations to establish a risk of retaliatory harm because the declarations contained "no discussion of the Doe plaintiffs' particular situations." *Id.* at 11. And, "while each declaration allege[d] retaliation or bias against free-speaking military personnel and their families, none allege[d] retaliation in connection with bringing suit in court." *Id.* The third-party declarations submitted by Plaintiffs likewise contain no discussion of the particular situations of Students A, B, C, or D, and do not allege any retaliation by Liberty in connection with bringing suit against the University in court. In short, the perceptions of three non-plaintiffs regarding the culture at Liberty have no bearing on whether the plaintiffs in this suit face any real threat of retaliation connected with this litigation.

Moreover, the declarations contain unreliable hearsay in the form of anonymous comments, stories, and concerns that the declarants allegedly heard from others. *Id.* at 12 (noting that third-party declarations did not support plaintiffs' use of pseudonyms because the declarants did not speak from personal knowledge and made claims based on what others confided in them); (*see* Best Decl. ¶¶ 21-22 (recounting a "sampling of things" that Best "heard" from Liberty University students and faculty members in response to his *Medium* article); M. Baggett Decl.

¶ 22, Ex. B to Baggett Decl. (sharing anonymous comments solicited by Baggett on Facebook about Liberty's decision to remain open after Spring Break); D. Baggett Decl. ¶ 6 ("I informally heard in conversation that there were 'folks in Green Hall' (where the administration is located) who were miffed at me.")).

Tellingly, Students A, B, C, and D do *not* offer their own declarations. Rather, they vaguely allege worries of embarrassment, criticism, and humiliation, and "vague, unsubstantiated fears of retaliatory acts by [Liberty's] higher-ups," none of which suffices to grant a motion to proceed anonymously. *Qualls*, 228 F.R.D. at 12; *see Pittsylvania Cty.*, 844 F. Supp. 2d at 733. Nor does Plaintiffs' argument that revealing their identities may affect their future employment prospects favor anonymity. *See Pittsylvania Cty.*, 844 F. Supp. 2d at 733 (threat of economic harm insufficient to permit use of pseudonyms); (Pls.' Resp. at 4). The remaining support attached to Plaintiffs' response, including the July 2019 *Washington Post* article describing a "culture of fear" and the Change.Org petition, has nothing to do with Liberty's response to COVID-19 during the Spring 2020 semester and cannot tip the scales in Plaintiffs' favor. *See Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 2008 WL 4755674, at *4 (D. Haw. Oct. 28, 2008), *aff'd sub nom. Doe ex rel. Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 2009 WL 308351 (D. Haw Feb. 6, 2009) (news articles discussing physical attacks on minors and adults based on race, sex, and disability did not support plaintiffs' request to use pseudonyms in case challenging admissions policy favoring students of Hawaiian ancestry because the articles "did not involve threats against anyone challenging [d]efendants' admissions policy").

Because Plaintiffs fail to establish a risk of retaliatory harm, the second *James* factor, like the first, weighs against anonymity.

**Age.** Plaintiffs, college-aged students, do not possess the "special vulnerability" of child-plaintiffs; thus, the age factor weighs against anonymity. *Pittsylvania Cty.*, 844 F. Supp. 2d at 729. In *Alger*, a case involving sexual misconduct, the court found that age favored anonymity because the students *"were all freshmen between the ages of 18 and 19 at the relevant times"* and young college students "may still possess the immaturity of adolescence." 317 F.R.D. at 41 (citation omitted). Plaintiffs concede that "they may not all be 18 or 19 years old" (i.e., they are *older*). (Pls.' Resp. at 7). Even if some of the Plaintiffs are 18 or 19, they "still ha[ve] surpassed the age at which protected status is typically accorded." *See Roe v. Doe*, 319 F. Supp. 3d 422, 429 (D.D.C. 2018) (denying anonymity request to defendant who was over 18 at the time of alleged sexual assault and noting that the age factor "concerns a protected status that is generally reserved to those who have not attained the age of majority"); *see also Doe v. Merten*, 219 F.R.D. 387, 393 (E.D. Va. 2004) (age did not favor anonymity where majority of plaintiffs were adults and minors were "on verge of adulthood"). Plaintiffs' level of maturity with regard to sexual matters is one thing that this Court need not concern itself with because the case at hand is about contractual rights of students and their school. Accordingly, Plaintiffs' age does *not* support anonymity in this case.

**Private vs. Government Actors**. The fourth factor likewise tips in favor of Liberty, a private university. Plaintiffs misconstrue the rationale behind this factor by identifying President Falwell as a "public figure" and arguing that Liberty does not act like "a private institution shying away from the court of public opinion." (Pls.' Resp. at 7-8.) "[C]ourts in general are less likely to grant a plaintiff permission to proceed anonymously when the plaintiff sues a private individual" because filing an action that challenges the constitutional validity of government activity "generally involves no injury to the Government's 'reputation,' while an action against a private party can result in damage to the defendant's reputation as well as economic harm." *Merten*, 219

8

F.R.D. at 394 (citing *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979) (additional quotations omitted)). Plaintiffs have publicly accused Liberty of "facilitating a culture of silence, fear, and intimidation," breaching student contract(s), and endangering students' health and finances with its response to COVID-19. (Am. Compl. ¶ 10; Pls.' Resp. at 3.) "Basic fairness dictates that those among [Liberty's] accusers who wish to participate in this suit as individual party plaintiffs must do so under their real names." *Wynne & Jaffe*, 599 F.2d at 713.[1]

**Risk of Harm to the Opposing Party**. Plaintiffs' refusal to reveal their identities to either the public *or* Liberty prevents the University from ascertaining which fees, if any, Students A, B, C, and D actually paid for the Spring 2020 semester. Such information is vital to assessing the individual Plaintiffs' ability to represent a class of other students who may have paid different fees, whether they suffered any damage as a result of the conduct alleged in the Amended Complaint, and whether they even have standing to bring their claims. Plaintiffs argue that "after liability is established," calculating damages "will be an exercise in mathematics." (Pls.' Resp. at 9.) Skipping the essential step of *establishing liability*, Plaintiffs wish to remain anonymous and have Liberty concede that they paid fees. (Pls.' Resp. at 8-9.) In reality, Plaintiffs may have received scholarships, account credits, grant awards, or other financial aid and not have suffered *any* harm. For example, Calum Best received a full scholarship from Liberty and admittedly "incurred *no additional expenses from the coronavirus impact*." (Best Decl. ¶ 11 (emphasis added).)

---

[1] Plaintiffs also do not seek to invalidate a law or any governmental activity, another consideration under this factor. *See Doe v. N. Carolina Cent. Univ.*, 1999 WL 1939248, at *4 (M.D.N.C. Apr. 15, 1999) (finding that fourth *James* did not weigh in favor of anonymity in suit against state university because case "[was] not a traditional action challenging the validity of a law or similar government activity").

9

Contrary to cases involving "purely legal" issues that "do not depend on identifying the specific parties," "an assessment of [P]laintiffs' standing to litigate these issues clearly does depend on their identity." *Merten*, 219 F.R.D. at 394 & n.22. *Id.* The plaintiffs in *Merten* claimed that certain Virginia universities denied them admission based on their status as undocumented immigrants and requested anonymity out of fear of deportation. *Id.* at 389-90. The court held that the fifth *James* factor weighed against anonymity because the plaintiffs' standing hinged on their ability to show possession of an unlawful or otherwise "problematic" immigration status that would cause them harm under the challenged admission policies. *Id.* at 394. The court explained that the defendants "of course, must in fairness, be allowed to explore whether plaintiffs have standing, which they can only do if plaintiffs are identified." *Id.* Liberty likewise must learn the identities of Students A, B, C, and D to fully explore and challenge Plaintiffs' standing and eliminate claims from students, like Best, who paid no fees, suffered no harm, and lack standing to sue.

Plaintiffs' approach also short circuits Liberty's ability to assess Plaintiffs' fitness to represent *any* class, as well as the scope of the classes Plaintiffs could represent *if* class treatment were appropriate. With the variety of fees students pay for different academic programs, different campus housing options, and different meal plans, as well the optional fees, such as lab fees, material fees and parking fees, just to name a few, Liberty has no idea what fees Plaintiffs have allegedly paid and in what amounts. Those facts bear directly on the appropriateness of class treatment in this case.

Expecting Liberty to concede that Students A, B, C, and D paid fees without revealing their identities also would improperly eliminate Plaintiffs' burden of establishing the damage element of their state law claims. To establish liability for breach of contract, one must prove a

10

"consequential injury or damage to the plaintiff." *Westminster Inv. Corp. v. Lamps Unlimited*, 379 S.E.2d 316, 317 (Va. 1989) (quoting *Caudill v. Wise Rambler*, 168 S.E.2d 257, 259 (Va. 1969)). "First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (2016) (citing *Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 311 (Va. 2006) (quotations omitted)). Thus, Plaintiffs must show some harm or injury in order to establish liability, and this is a distinct prerequisite to proving any quantum of compensatory damages. *Bailey v. Potter*, 2006 WL 1582410, at *3-4 (E.D. Va. June 5, 2006) (noting that even nominal damages are unavailable unless plaintiff first shows some consequential injury resulting from an alleged breach of contract). By refusing to reveal their identities and demanding Liberty to concede that Plaintiffs paid fees, (Pls.' Resp. at 8), Plaintiffs attempt to skip the first step in establishing damage and evade their burden of proof.

Finally, "civil actions against private parties expose them to the risk of reputational and economic harms," as noted above. *Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 810 (E.D. Va. 2012) (citing *Wynne & Jaffe*, 599 F.2d at 713). Permitting Plaintiffs to proceed anonymously "would invite meritless lawsuits from other [students]," "offering them a forum to tarnish the reputation of [Liberty] without risk of harm to their own reputation." *Id.* Because Plaintiffs' anonymity poses a substantial risk of harm to Liberty, the fifth factor, like the first four, militates strongly against allowing Plaintiffs to proceed under pseudonyms.

Ultimately, Plaintiffs' purported fears about revealing their identity "are not so extraordinary as to outweigh the inherent public interest in transparent judicial proceedings." *Pittsylvania Cty.*, 844 F. Supp. 2d at 746 (quoting *F.B. v. East Stroudsburg Univ.*, 2009 WL

11

2003363, at *4 (M.D. Pa. July 7, 2009)). Because Plaintiffs' use of pseudonyms is procedurally and substantively improper, the Court should grant Liberty's motion and strike all allegations from the Amended Complaint.

**2.     In the Alternative, the Court should require Plaintiffs to make a more definitive statement.**

Plaintiffs must (1) reveal their identities; (2) specify which fees they paid for the Spring 2020 semester; and (3) identify the terms of the contract(s) that they claim Liberty breached in order for Liberty to frame a meaningful response to the Amended Complaint. Because Liberty "had no trouble filing a motion to dismiss," Plaintiffs assert that Liberty does not need to know their identities to frame a response. (Pls.' Resp. at 8, n.7.) This argument ignores the fact that Liberty moved to dismiss Plaintiffs' claims, in part, because the Amended Complaint fails to identify the parties' contract(s), the terms of the contract(s), what fees Plaintiffs allegedly paid, what fees Liberty allegedly withheld, which services and activities Liberty allegedly failed to provide, and which services and activities Plaintiffs would have used but for Liberty's alleged campus "closing." (*See generally* Def.'s Mem. in Supp. of Mot to Dismiss (ECF No. 23).) Without this information, Liberty must repeatedly declare that it "is without sufficient information to admit or deny" the vague allegations in the Amended Complaint. Accordingly, the Court should require Plaintiffs to provide a more definite statement.

### III.    CONCLUSION

For these reasons, Liberty respectfully requests that the Court grant its Motion to Strike or, in the alternative, Motion for a More Definite Statement, and award Liberty its costs and such further relief that the Court deems proper.

Respectfully submitted,

**LIBERTY UNIVERSITY, INC.,
d/b/a LIBERTY UNIVERSITY**

By: /s/Turner A. Broughton
Turner A. Broughton, Esquire (VSB #42627)
Harold E. Johnson, Esquire (VSB #65591)
Amanda H. Bird, Esquire (VSB #92110)
Williams Mullen
200 South 10th Street, Suite 1600
Richmond, VA 23218
Telephone: (804) 420-6000
Facsimile: (804) 420-6507
tbroughton@williamsmullen.com
hjohnson@williamsmullen.com

Benjamin G. Chew, Esquire (VSB # 29113)
Michael Bowe (*pro hac vice* pending)
Michael Winograd (*pro hac vice* pending)
Jessica N. Meyers (*pro hac vice* pending)
Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
bchew@brownrudnick.com
mbowe@brownrudnick.com
mwinograd@brownrudnick.com
jmeyers@brownrudnick.com
*Counsel for Defendant Liberty University, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 31, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

E. Kyle McNew
J. Gregory Webb
Lisa S. Brook
**MICHIEHAMLETT**
310 4th Street, NE
Charlottesville, Virginia 22902
Tel.: 434-951-7231
kmcnew@michiehamlett.com
gwebb@michiehamlett.com
lbrook@michiehamlett.com

Adam J. Levitt Amy E.
Keller Laura E. Reasons
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
lreasons@dicellolevitt.com

Matthew S. Miller
MATTHEW S. MILLER LLC
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
Tel.: 312-741-1085
mmiller@msmillerlaw.com

    By: /s/Turner A. Broughton
    Turner A. Broughton, Esquire (VSB #42627)
    Harold E. Johnson, Esquire (VSB #65591)
    Amanda H. Bird, Esquire (VSB #92110)
    Williams Mullen
    200 South 10th Street, Suite 1600
    Richmond, VA 23218
    Telephone: (804) 420-6000
    Facsimile: (804) 420-6507
    tbroughton@williamsmullen.com
    hjohnson@williamsmullen.com
    abird@williamsmullen.com