CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
10/10/2023
LAURA A. AUSTIN, CLERK
BY:   s/ CARMEN AMOS
     DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| STUDENT A, STUDENT C, and STUDENT D, individually and on behalf of others similarly situated, | |
| | Case No.: 6:20-cv-00023 |
| *Plaintiffs*, | |
| | <u>MEMORANDUM OPINION</u> |
| v. | |
| LIBERTY UNIVERSITY, INC., d/b/a, LIBERTY UNIVERSITY, | Judge Norman K. Moon |
| *Defendant*. | |

In this putative class action, several students at Liberty University seek a refund for various fees and room and board they paid for the Spring 2020 semester. They assert that Liberty did not provide the activities and services that they paid for with those fees, when, they contend, Liberty effectively closed its campus that semester in response to the COVID-19 pandemic.

This matter is before the Court on Plaintiffs' motion to certify a class. For the following reasons, the Court holds that even if the named Plaintiffs previously had standing to sue, their claims have since been mooted. Liberty's voluntary payments and monetary credits to the named Plaintiffs for COVID-19 relief more than compensated them for any liability Liberty owed them from the prorated fees.

Plaintiffs' class certification motion also fails on the merits. Highly individualized, intertwined questions of liability and damages predominate. Specifically, it is an open question which, if any, portion of the over *six hundred* different fees actually went "unused" by each of

approximately 14,000 Liberty students who were enrolled in any of its *seventeen* colleges in undergraduate and graduate studies. The three named Plaintiffs—all undergraduate students— have not demonstrated commonality or that their claims were typical of the class they seek to represent. Neither have they shown that common questions predominate in a class proceeding, nor that a class action is the superior method to resolve such claims. Accordingly, Plaintiffs' motion is denied, and the case will be dismissed.

## Background

1. *Liberty University's Spring 2020 Semester*

Liberty University is an evangelical Christian liberal arts institution in Lynchburg, Virginia, which is comprised of seventeen colleges and schools.[1] These include, among others, Liberty's College of Arts & Sciences, School of Aeronautics, School of Business, School of Divinity, School of Education, School of Engineering, School of Government, School of Health Sciences, School of Music, and School of Nursing.[2]

Liberty's Spring 2020 semester began on January 13, 2020, shortly before the COVID-19 pandemic first impacted Virginia.[3] On March 12, 2020, the then-Governor of Virginia declared a state of emergency, and on March 30, 2020, he issued a "stay at home" order for all Virginians.[4]

On March 16, 2020, Liberty announced that it was transitioning most of its residential classes to an online digital format beginning on March 23.[5] That announcement was followed-up

---

[1] Am. Compl. ¶ 23, Dkt. 17; Answer ¶ 23, Dkt. 134; Dkt. 89-12 at ECF 81.

[2] *See* Dkt. 89-13.

[3] Am. Compl. ¶ 28; Answer ¶ 28.

[4] Am. Compl. ¶ 42; Answer ¶ 42.

[5] Am. Compl. ¶ 43 & n. 10; Answer ¶ 43; Cooper Decl. ¶ 5, Dkt. 89-1.

by a campus-wide email on March 17.[6] However, in Plaintiffs' view, the campus had "effectively been shut down."[7] The upshot was that Liberty permitted students to remain on campus.[8] Liberty's campus residence halls remained open.[9] Similarly, Liberty's dining facilities remained open and staffed, though they were modified for "take-out" meals only.[10] Liberty gave its students the option to return to campus following spring break where most could resume their classes in an online format, or they could complete their courses from a remote location.[11]

After March 29, 2020, 2,284 students continued to reside on campus; by the end of the Spring 2020 semester, 1,536 students remained on campus.[12] Final exams concluded on May 5, 2020, and students were required to move out of their residence halls on May 6, 2020.[13]

### 2. *Liberty's Contracts with Students*

Each Liberty student must agree to a Financial Check-In Contract ("FCI Contract") with Liberty when they register for classes.[14] The FCI Contract provides that "[t]his contract documents the agreement you've made with Liberty University."[15] The FCI Contract includes a "Financial Responsibility Agreement," which states that it "constitutes a binding contract

---

[6] Am. Compl. ¶ 45; Answer ¶ 45.

[7] Am. Compl. ¶ 8; *see also id.* ¶ 2 (noting that "the University purports to remain open").

[8] Am. Compl. ¶¶ 7–8.

[9] Am. Compl. ¶ 44; Answer ¶ 44.

[10] Cooper Decl. ¶ 7; *see also* Am. Compl. ¶ 6.

[11] Cooper Decl. ¶ 8; *see also* Am. Compl. ¶¶ 7, 38, 44.

[12] Cooper Decl. ¶ 9.

[13] Am. Compl. ¶¶ 28–29; Answer ¶¶ 28–29.

[14] Cooper Decl. ¶ 12.

[15] *E.g.*, Dkt. 89-8 at 1 (Student A FCI Contract).

between the student and Liberty University, Inc. [ ] regarding the matters addressed herein," including terms concerning "payment of fees" and "promise to pay":

> **Payment obligation**: I understand and agree that when I register for any class at Liberty or receive any service at Liberty, I accept full responsibility to pay all tuition and other associated costs assessed as a result of my registration and/or receipt of services in accordance with the applicable fee schedule as shown on the Summary of Account, according to the Payment Plan Selection previously chosen during Financial Check In ("FCI"), and pursuant to all applicable Liberty Academic Catalogues located at www.liberty.edu/academics/catalogs, the Liberty Way, and all applicable Liberty Codes of Conduct, Codes of Honor, policies and procedures which are incorporated herein by reference and to which I expressly agree to be bound.

Dkt. 89-8 at 2.

The FCI Contract concludes with a space for the student to enter their electronic signature to the contract. The electronic signature portion of the FCI Contract provides as follows:

> **Electronic Signature:**  By submitting my typed name as indicated below, I acknowledge and agree that I have read, understood, and accepted the terms and conditions of this Agreement. By submitting my typed name as indicated below, I acknowledge and agree that I am obligated to pay all costs and expenses at Liberty University, and promise to pay Liberty University, or any subsequent holder of the debt, the balance plus interest and other fees which may become due pursuant to this Agreement.

Dkt. 89-8 at 4.

The FCI Contract contains the same general contract terms for each Liberty student.[16] However, each FCI Contract contains a "Summary of Account" page that specifically identifies each student's total semester charges (e.g., fees, room and board, dining plan, and tuition), and payments (e.g., academic scholarships, governmental loans and grants).[17]

---

[16] Cooper Decl. ¶¶ 12–16; Dkt. 89-8 at 2–4; Dkt. 89 at 4.

[17] Cooper Decl. ¶¶ 13–15; Dkt. 89-8 at 1 (Summary of Account for Student A).

3. *Students A, C, and D*

This case is brought by three individual plaintiffs on behalf of the putative class, identified as Students A, C, and D (occasionally, the "named Plaintiffs").[18] They were students at Liberty during the Spring 2020 semester.[19] Student A was an undergraduate student studying history, who lived off campus that semester.[20] Student C was an undergraduate student pursuing an interdisciplinary studies degree (with coursework in fine arts, religious studies, and American Sign Language), and was living on campus that semester.[21] Finally, Student D was an undergraduate student pursuing a Bachelor of Science degree in mechanical engineering, and was also living on campus.[22] Students A, C, and D all decided not to return to campus after spring break in 2020 (March 16–20, 2020), though other students remained on campus afterward.[23] They acknowledge that Liberty did not require them to move out, but that it was their own decision to do so.[24]

Plaintiffs seek to recoup the "prorated, unused" portion of fees they paid to Liberty for the Spring 2020 semester.[25] The parties calculate that portion of fees by taking each student's

---

[18] A fourth individual plaintiff, Student B, filed a notice of voluntary dismissal of their claims in this case. Dkt. 57.

[19] Am. Compl. ¶¶ 18, 20, 21; Answer ¶¶ 18, 20, 21.

[20] Dkt. 89-2 ("Student A Dep.") at 24:1–10.

[21] Dkt. 89-3 ("Student C Dep.") at 41:11–42:5, 76:1–21.

[22] Dkt. 89-4 ("Student D Dep.") at 24:16–21, 33:6–12.

[23] Student A Dep. at 29:6–19, 30:10–19, 33:4–7; Student C Dep. at 22:10–23:11; Student D Dep. at 42:12–20.

[24] *See, e.g.*, Student A Dep. at 40:12–41:3 (testifying that Liberty's email to students had "encourag[ed] us to go home"); Student C Dep. at 22:10–23:11 (testifying that Liberty "strongly recommend[ed]" but did not "forc[e]" anyone to leave); Student D Dep. at 44:17–45:3 (Q. "Did Liberty require you to move out of your residence hall in the spring of 2020?" A. "No, sir." Q. "That was your decision?" A. "Yes, sir.").

[25] Am. Compl. ¶ 17.

Spring 2020 semester fees and multiplying that by the portion of the semester that remained when Liberty moved most of its classes online (March 23) until the semester's end (May 6).[26] When most classes moved online, about 37 percent of the semester remained, meaning that Plaintiffs at most seek a refund of 37 percent of the fees they were charged for the Spring 2020 semester.[27] The following table reflects the fees that Liberty charged to Students A, C and D in the Spring 2020 semester, as well as the prorated amounts for which they are seeking damages.

**TABLE 1**[28]

| Student | Fees Charged | | Semester Total | Prorated Fees |
|---|---|---|---|---|
| Student A | Online Content Fee | $50 | $1,370.21 | $506.98 |
| | Parking | $100 | | |
| | Health Center | $170 | | |
| | Dining Plan | $665 | | |
| | Activity | $385 | | |
| | Monthly Printing | $0.21 | | |
| Student C | Online Content Fee | $65 | $5,828.80 | $2,156.66 |
| | Book Voucher Advance | $61.10 | | |
| | Degree Completion Fee | $100 | | |
| | Housing | $2,900 | | |
| | Student Health | $170 | | |
| | Dining Plan | $2,090 | | |
| | Pay Plan Participation Fee | $50 | | |
| | Monthly Printing | $7.70 | | |
| | Activity Fee | $385 | | |
| | *[Continued onto next page]* | | | |

---

[26] Am. Compl. ¶¶ 28, 43, 59, 73, 78.

[27] Cooper Decl. ¶ 20.

[28] Cooper Decl. ¶ 22; Dkt. 89 at 7–8; Dkt. 89-8 ("Student A FCI Contract") at 1; Dkt. 89-9 ("Student C FCI Contract") at 1; Dkt. 89-10 ("Student D FCI Contract") at 1. Student C's FCI contract reflects a $61.10 book voucher advance rather than $51.95 as in the Cooper Declaration, so the Court has used the larger fee in Plaintiffs' favor. The Court notes that Plaintiffs do not contest the fee calculations and even use the slightly lower amount. Dkt. 99 at 5. In any event, the difference is immaterial.

| Student D | Online Content Fee | $117 | $5,867.97 | $2,171.15 |
|---|---|---|---|---|
| | Housing | $2,900 | | |
| | Student Health | $170 | | |
| | Material Fee | $110 | | |
| | Material Fee | $45 | | |
| | Dining Plan | $2,090 | | |
| | Pay Plan Participation Fee | $50 | | |
| | Monthly Printing | $0.97 | | |
| | Activity Fee | $385 | | |

4. *Housing Credits and Meal Plan Credits*

On March 20, 2020, Liberty announced that students who chose not to return to their on-campus housing for the rest of the Spring 2020 semester (departing campus as of March 28), would receive a $1,000 credit toward any of their Fall 2020 semester charges, such as room, board, tuition, or fees. Cooper Decl. ¶ 23. For students who returned to campus in Fall 2020, Liberty applied the credit toward their Fall 2020 semester charges. Meanwhile, graduating students received a refund if the housing balance credit left a positive balance on their account. *Id.* ¶ 24. Liberty described the program as a "customer service measure." *Id.* ¶ 23.

Liberty disbursed the housing credits to 5,430 students, which had a value of $5,400,000. *Id.* ¶ 25. Students C and D received the $1,000 housing credit. *Id.* ¶¶ 25, 41.

Liberty also "rolled over" credits for the unused portions of students' Spring 2020 meal plans if the student purchased another meal plan for the Fall 2020 semester. *Id.* ¶ 26. Liberty distributed meal plan credits to 2,013 students in this manner. *Id.* ¶ 27. Among those were Plaintiff Student A, who received about $480 in value of meal plan "roll-over swipes" that carried over to the Fall 2020 semester. *Id.*

5. *COVID Emergency Relief Funds*

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. 116-136, 134 Stat. 281 (2020). The Act included funds designated for

the Higher Education Emergency Relief Fund ("HEERF I"). *Id.* § 18004. Liberty applied for

funds from HEERF and on June 25, 2020, Liberty received $15,205,124 in such funds. Dkt. 89-1

at 8 ¶¶ 29–30 (Cooper Decl.).

The CARES Act specified the "uses of funds" made available under HEERF I. CARES

Act § 18004(c). The Act provided that "[i]nstitutions of higher education shall use no less than

50 percent of such funds to provide emergency financial aid grants to students for expenses

related to the disruption of campus operations due to coronavirus." *Id.* Such expenses included

"eligible expenses under a student's cost of attendance, such as food, housing, course materials,

technology, health care, and child care." *Id.* The parties refer to this as the "Student Portion" of

the CARES Act emergency funds. Cooper Decl. ¶ 31; Dkt. 89 at 11; Dkt. 99 at 4.

As to the remaining portion of funds (totaling no more than 50 percent of the funds

provided), the Act specified that "an institution of higher education … may use the funds to

cover any costs associated with significant changes to the delivery of instruction due to the

coronavirus." CARES Act § 18004(c). The parties refer to this as the "Institutional Portion" of

the emergency funds.[29] The Act provided certain restrictions on uses for the Institutional Portion,

including that such funds could not be used for "payment to contractors for the provision of pre-

enrollment recruitment activities; endowments; or capital outlays associated with facilities

related to athletics, sectarian instruction, or religious worship." *Id.*

Liberty disbursed the entirety of the $15,205,124 in CARES Act funds it received to

students in the form of emergency financial aid grants to eligible students enrolled in on-campus

classes during the Spring 2020 semester. Cooper Decl. ¶¶ 30, 33. That included the entirety of

the Institutional Portion of CARES Act funds Liberty had received. *Id.*

---

[29] Cooper Decl. ¶ 32; Dkt. 89 at 11; Dkt. 99 at 4.

In addition, the federal government disbursed additional COVID relief funds to higher educational institutions via the Coronavirus Response and Relief Supplemental Appropriations Act. Pub. L. 116-260, 134 Stat. 1932 (2020). Liberty received $10,221,498 in these "HEERF II" funds that Liberty distributed to students as additional emergency financial aid grants to students affected by COVID-19 during the Spring 2020 semester. Cooper Decl. ¶ 44. In total, Liberty disbursed $25,426,622 in CARES Act and HEERF II emergency financial aid grants to 14,957 students. *Id.* ¶¶ 49–50. Student A, C and D received from Liberty the following funds made available by the CARES Act under the HEERF I program.[30]

TABLE 2[31]

| Student | CARES Act Funds | | Amount |
|---------|-----------------|--|--------|
| Student A | Spring Student Portion<br>Spring Institutional Portion<br>Fall Institutional Portion | $1,365<br>$430<br>$753.90 | $2,548.90 |
| Student C | Spring Student Portion<br>Spring Institutional Portion<br>Fall Institutional Portion<br>Housing Credit | $1,365<br>$450<br>$762.30<br>$1,000 | $3,577.30 |

---

[30] The picture for the HEERF II funds is a little more complicated. Liberty writes that "Students A, C and D did not receive any emergency grants out of the HEERF II funds." Dkt. 89 at 14. In fact, however, Liberty's evidence shows that Students A and D *did* receive HERFF II funds: each receiving $2,616. Cooper Decl. ¶¶ 47, 48. However, Students A and D did not receive HEERF II relief to cover unmet expenses due to COVID-19 campus disruption in the Spring 2020, because Liberty found that they had "already received CARES Act funds that exceeded their prorated fee total for the Spring 2020 semester." *Id.* ¶¶ 45, 47. Rather, Students A and D got HEERF II funds because they fell into a second category of eligible students: those "who had a Pell eligible expected financial contribution and were enrolled in the 2020-2021 academic year." *Id.* Student C was ineligible for HEERF II distributions because she graduated. *Id.* ¶ 47. In any event, as neither party argues HEERF II relief afforded to Students A and D should offset Liberty's liability, nor that it impacts whether any plaintiff suffered an injury-in-fact, the Court will only address the parties' arguments as to the CARES Act HEERF I funds.

[31] *See* Cooper Decl. ¶ 41; Dkt. 89 at 14; Dkt. 89-3 (Dep. of Student C) at 108:13–17; Dkt. 99 at 5 (Plaintiffs use and do not challenge Liberty's calculation of prorated fees and CARES Act HEERF I funds received).

| Student D | Spring Student Portion | $1,365 | $3,577.30 |
| | Spring Institutional Portion | $450 | |
| | Fall Institutional Portion | $762.30 | |
| | Housing Credit | $1,000 | |

To distribute the CARES Act funds promptly, Liberty divided students into five broad categories to determine the initial amount of financial aid grants.

- Students who resided on campus and left Lynchburg housing by March 28, 2020, received an initial amount of about **$1,815.00.**

- Students who resided on campus and stayed in Lynchburg past March 28, 2020, received an initial amount of about **$285.00**.

- Students who resided off campus (with meal plan) and left Lynchburg by March 28, 2020, received an initial amount of about **$1,795.00**.

- Students who resided off campus (with no meal plan) and left Lynchburg by March 28, 2020, received an initial amount of about **$1,615.00**.

- Students who resided off campus but remained in Lynchburg for the Spring 2020 semester received an initial amount of about **$395.00**.[32]

Liberty attested that it calculated the amounts awarded in these categories taking into account costs of "(i) travel and transportation (e.g., vehicle insurance and rentals), (ii) internet and technology (e.g., cell phone charges and course fees), (iii) housing (e.g., shelter, utilities, housekeeping supplies, furnishings, and other household equipment), (iv) meals, (v) health services, (vi) parking, and (vii) activity fees."[33] Liberty further attested that it pursued this approach toward disbursing these CARES Act funds "because determining each student's costs and expenses would have required a highly individualized, time consuming, and costly endeavor."[34]

---

[32] Cooper Decl. ¶ 34.

[33] Cooper Decl. ¶ 35.

[34] Cooper Decl. ¶ 36.

6. *Comparison of Prorated Fees, and Credits and Cares Act Funds*

The table below compares Plaintiffs' prorated fees for the Spring 2020 semester, with the total credits and Institutional Portion (only) of the CARES Act funds that Liberty distributed to Plaintiffs.

**TABLE 3**

| Student | Prorated Fees From Table 1 | Credits & Inst'l Portion Only of CARES Act Funds From Table 2 | Credits Minus Prorated Fees (Column 3 – 2) |
|---------|---------------------------|--------------------------------------------------------------|---------------------------------------------|
| Student A | $506.98 | $1,183.90 | $676.92 |
| Student C | $2,156.66 | $2,212.30 | $55.64 |
| Student D | $2,171.15 | $2,212.30 | $41.15 |

7. *Scholarships, Grants, and Other Sources of Funding*

Liberty also offers a number of scholarships, loans, and grants to students. Liberty provides academic scholarships, athletic scholarships, scholarships based on geographic diversity and in-state residency, and various scholarships and awards for Evangelical service and service in summer ministries. Dkt. 89 at 8 (citing Liberty Scholarships website); Cooper Decl. ¶ 15. In addition, Liberty students receive grants from federal and state government, including Federal Pell Grants (need-based awards); Federal Supplemental Educational Opportunity Grants ("FSEOG") (need-based awards for students with no expected family contribution). Dkt. 89 at 8; Cooper Decl. ¶¶ 15, 22. Nearly 95 percent of Liberty students receive some form of financial aid. Cooper Decl. ¶ 15. Other sources of scholarships, grants, and funds for student education may be available. Dkt. 89 at 9.

Liberty's scholarships and government loans and grants are disbursed directly onto each

Liberty's students account as credits, offsetting any charges for tuition and fees, and with any

excess credits being refunded to the student. Cooper Decl. ¶¶ 13, 15. Students A, C, and D each

received the following grants and scholarships for the Spring 2020 semester:

**TABLE 4**

| Student | Grants and Scholarships Spring 2020 Semester | | Amount |
|---------|----------------------|----------|--------|
| Student A | Federal Pell Grant | $3,097 | $6,497 |
| | Liberty Book Dollars | $400 | |
| | Early Deposit Award | $2,000 | |
| | Liberty Champion Award | $500 | |
| | FSEOG | $500 | |
| Student C | Federal Pell Grant | $3,097 | $8,222 |
| | Liberty Supplemental Grant | $750 | |
| | Liberty Scholars Grant | $1,000 | |
| | FSEOG | $500 | |
| | Liberty Champion Award | $1,750 | |
| | Academic Scholarship | $1,125 | |
| Student D | Federal Pell Grant | $3,097 | $7,697 |
| | Liberty Supplemental Grant | $750 | |
| | Liberty Scholars Grant | $1,100 | |
| | FSEOG | $500 | |
| | Liberty Champion Award | $1,000 | |
| | Academic Scholarship | $1,250 | |

*See* Cooper Decl. ¶ 22; Dkt. 89 at 10.

<u>**Procedural History**</u>

The named Plaintiffs filed a putative class action against Liberty, and subsequently filed

the operative first amended complaint. Dkt. 17. Plaintiffs brought four state-law claims against

Liberty: breach of contract, unjust enrichment, conversion, and violation of the Virginia

Consumer Protection Act ("VCPA"), Va. Code § 59.1-196, *et seq.* Am. Compl. at 19–23. Liberty

filed a motion to dismiss, which the Court granted in part—permitting Plaintiffs' breach of

contract and unjust claims to proceed, but dismissing Plaintiffs' conversation and VCPA claims. Dkts. 125, 126.

While Liberty's motion to dismiss was pending, the named Plaintiffs filed a motion to certify a class. Dkts. 42, 43. In their motion, they sought certification of a class comprised of: "All students who paid fees (including but not limited to campus fees, room, board, parking, and other fees as broadly defined herein) in connection with enrollment in live, on-campus classes at Liberty University for the Spring 2020 semester." Dkt. 42 at 1. The named Plaintiffs argued that the proposed class not only satisfied the basic requirements of Rule 23(a) of the Federal Rules of Civil Procedure, but also the requirements of Rule 23(b), requiring that the common questions predominate over individual ones and that proceeding as a class would be the superior method of resolving the controversy. Dkt. 43 at 6–15. Alternatively, the named Plaintiffs argued that certification under Rule 23(b)(2) or 23(c)(4) would be appropriate. *Id.* at 15–17.

Liberty opposed class certification. Dkt. 89. First, Liberty argued that the named Plaintiffs could not satisfy the requirements of Article III, because Liberty had voluntarily paid them sums exceeding their total asserted damages. *Id.* at 16–19. Second, Liberty argued that the named Plaintiffs cannot establish Rule 23(a)'s requirements of commonality or typicality, Dkt. 89 at 21–23, cannot show that the named Plaintiffs adequately represent the class, *id.* at 23–24, and cannot show that the more demanding requirements of Rule 23(b)(3) have been satisfied, *id.* at 24–27. Liberty also asserted that the named Plaintiffs' alternative requests for certification under Rule 23(b)(2) or Rule 23(c)(4) similarly fail. Dkt. 89 at 27–28. The named Plaintiffs filed a reply in further support of class certification, Dkt. 99, and, following issuance of the Court's opinion granting in part and denying in part Liberty's motion to dismiss, the parties filed

supplemental memoranda on class certification, Dkts. 135–36. The Court also heard argument on the named Plaintiffs' motion to certify the class. It is ripe for disposition.

### Standard of Review

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure tests a district court's subject matter jurisdiction. The plaintiff bears the burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion, as the party asserting the court's jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A trial court may consider evidence and matters outside the complaint on a Rule 12(b)(1) motion without converting the proceeding to one for summary judgment. *Id.*

### Article III

Liberty argues that its "distribution of credits and CARES Act funds to Students A, C, and D mooted this lawsuit because Plaintiffs have no damages." Dkt. 89 at 16. In Liberty's view, it has "awarded Students A, C, and D *more* money than the total prorated portion of fees charged for the Spring 2020 semester," in housing credits, meal plan credits, and CARES Act funds. *Id.* at 17–18. Liberty concludes that, because those distributions "exceed[ ] the total amount of fees Plaintiffs seek to recover and affords them complete relief for their claims, no live controversy remains." *Id.* at 18. In addition, Liberty argues that "[e]ven if Plaintiffs could establish a live controversy, Plaintiffs lack standing because they fail to allege a particularized injury fairly traceable to Liberty's conduct." *Id.* at 18.

Plaintiffs disagree. They assert that the CARES Act funds that Liberty distributed was "taxpayer money"—"not Liberty's money and it was not the money the students paid directly to Liberty for the benefit of campus services, facilities, or room and board." Dkt. 99 at 4 (emphasis omitted). Plaintiffs further contend that they "were injured in-fact," sufficient for Article III

purposes, because "they did not receive full, unencumbered refunds of the amounts they seek." *Id.* at 7–8. And Plaintiffs argue that "[t]he collateral source rule bars Liberty from receiving credit for distributing government stimulus funds." *Id.* at 8–11.

Before turning to Rule 23's requirements, the Court must first address whether Article III of the Constitution precludes the Court's ability to hear this suit—either because Plaintiffs lack standing or because their claims have been mooted. The Court concludes that, because Liberty had voluntarily paid to Students A, C and D amounts that exceed their total asserted financial injury, amounts paid from Liberty's own coffers, the named Plaintiffs' claims have been mooted.

    1. *Applicable Law*

Article III of the Constitution grants federal courts the power to decide legal questions only if there is an actual "case" or "controvers[y]." U.S. Const., Art. III, § 2. To invoke the jurisdiction of the federal courts, "a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted). "Unlike questions of mootness and ripeness, the standing inquiry asks whether a plaintiff had the requisite personal stake in the outcome of a case 'at the outset of the litigation.'" *Deal v. Mercer County Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). The "irreducible constitutional minimum of standing" contains three elements: (1) the plaintiff suffered an injury in fact, (2) causally connected to the conduct complained of, that (3) will likely be redressed if the plaintiff prevails. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Supreme Court has also interpreted Article III's limitation of federal court jurisdiction to "cases" and "controversies" to "demand that an actual controversy … be extant at

all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (internal quotation marks omitted). If an "intervening circumstance" should deprive the plaintiff of a "personal stake in the outcome of the lawsuit," regardless of the stage of the lawsuit, the case "must be dismissed as moot." *Id.* at 160–61; *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 338, 396 (1980) (explaining that "mootness has two aspects: when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"). However, a case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co.*, 577 U.S. at 161. In other words, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.*

"The strictures of Article III standing are no less important in the context of class actions." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020). Accordingly, in a putative class action, the court must "analyze standing based on the allegations of personal injury made by the named plaintiffs." *Id.*

2. *Liberty's Payment to the Named Plaintiffs of its Institutional Portion of CARES Act Funds & Credits Exceed Plaintiffs' Prorated Fees*

Here, even if the named Plaintiffs possessed "the requisite personal stake in the outcome of a case at the outset of the litigation," *see Deal*, 911 F.3d at 187 (quotation marks omitted), intervening circumstances—namely Liberty's payment of the Institutional Portion of CARES Act funds and other credits—mooted their claims, *Campbell-Ewald Co.*, 577 U.S. at 160–61. Plaintiffs assert that they suffered an injury in fact in the amount of the allegedly unused prorated portion of fees they paid for the Spring 2020 semester. *See* Am. Compl. ¶¶ 1, 17; Dkt. 99 at 3, 5. But, as the data in Table 3 reflects, Liberty paid each of the named Plaintiffs, from its own

16

coffers, amounts exceeding their prorated fees.[35] Indeed, and just considering Liberty's payments of the Institutional Portion of the CARES Act funds and its issuance of housing credits, Liberty paid Student A  $1,183.90 ($676.92 more than her prorated fees for the semester); Liberty paid Student C  $2,212.30 ($55.64 more than her prorated fees for the semester); and Liberty paid Student D  $2,212.30 ($41.15 more than her prorated fees for the semester). *See supra* p. 11 (Table 3).

Plaintiffs' contrary arguments do not change this picture. Plaintiffs first assert that the Court should not consider in the standing/ mootness analysis payments Liberty made from the *Student Portion* of the CARES Act funds, as they were funds that the Government required Liberty to pay to the students. *See* Dkt. 99 at 4–5; CARES Act § 18004(c); Cooper Decl. ¶ 31. The Court agrees. For those funds, Liberty was truly nothing more than a "pass through" entity—never possessed of any legal right to retain or use the funds except to pass them through to its students. But in contrast to the Student Portion of the CARES Act funds, Congress appropriated and distributed the *Institutional Portion* of CARES Act funds for higher educational institutions' (and here, Liberty's) own use—i.e., "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." CARES Act § 18004(c). Put plainly, Liberty could have spent the funds on itself, so long as it spent them on permissible projects. But it did not. Instead, Liberty chose to give the funds to its students. In fact, Plaintiffs concede—as they must—that Liberty need not have given those funds to its students. Dkt. 99 at

---

[35] Although it appears Liberty paid the housing credit and other credits before the named Plaintiffs filed their suit, Liberty only received the CARES Act funds in June 2020, after suit was filed in April 2020. *See* Cooper Decl. ¶¶ 29–30. Therefore, even if the named Plaintiffs had a sufficient stake in their claims when the suit was first filed, their claims were mooted by the subsequent payments.

5–6 & n. 5 (recognizing "there were many other permissible uses of the institutional portion of the CARES/HEERF I funds").

"So what?", Plaintiffs contend. In their view, those payments are irrelevant to the issue whether they suffered an "injury in fact." They argue that Liberty is not entitled to any "credit" or offset from disbursing even the Institutional Portion of the CARES Act funds. Dkt. 124 ("Hr'g Tr.") at 23. That is because, Plaintiffs assert, "Liberty *never* informed the students receiving those distributions that it was refunding them for anything." Dkt. 99 at 5. They claim that "there is no actual evidence that those funds reimbursed fees and room and board," rather than, for example, "simply emergency grants to students." *Id.* at 6 & n. 5; Hr'g Tr. at 23. Not so. Plaintiffs' argument is contrary to the facts and the law.

The CARES Act states educational institutions "shall use no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, healthcare, and child care)." CARES Act § 18004(c). Agency guidance similarly explained that an educational institution could spend its Institutional Portion to "make additional emergency financial aid grants to students," *if* such distributions met the same statutory requirements as the Student Portion—i.e., that "such emergency financial aid grants are for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care."[36] That is just what Liberty did. Liberty not only provided the Student Portion of the CARES Act funds to its

---

[36] U.S. Dep't of Educ., *Higher Education Emergency Relief Fund FAQs*, https://www2.ed.gov/about/offices/list/ope/heerfinstitutionalfaqs.pdf (last visited Oct. 4, 2023) (FAQ 5).

students to cover "expenses related to disruption of campus operations due to coronavirus," but directed that the "*entirety* of the [CARES Act] funds would go directly to [Liberty's] students," including the Institutional Portion, for that statutory purpose. Dkt. 89 at 12 (citing July 1, 2020 Statement[37]) (emphasis added); Hr'g Tr. at 38. More clearly yet, Liberty's statement explaining how it would disburse CARES Act funds expressly acknowledged that, "[w]hen we were forced to transition to all online learning, *many of our students incurred unexpected costs and some did not make full use of on-campus services for which they paid.*" July 1, 2020 Statement (emphasis added).[38] Plaintiffs are simply mistaken in arguing that there is not "any evidence that [Liberty] used the institutional portion as a fee reimbursement." Hr'g Tr. at 23.

Undeterred, Plaintiffs complain that "there is not a dollar-for-dollar payment" statement, i.e., no itemized list offsetting specific fees with credits from CARES Act funds. *Id.* That may be. But Plaintiffs cite no authority that a party suffers an injury-in-fact—notwithstanding that the alleged tortfeasor compensated them from its own coffers an amount exceeding total financial injury, and that the tortfeasor said the payment was at least in part for the asserted financial injury—merely because such tortfeasor did not itemize compensation against each facet of total asserted financial injury. Nor is the Court aware of such precedent. Plaintiffs' issue with these funds becomes even more tenuous when they acknowledge—as they must—that Liberty "*could have* refunded students for the cost of fees and room and board, and then reimbursed itself from the institutional portion of the CARES funds." Dkt. 99 at 6. At bottom, Plaintiffs ask this Court

---

[37] *See* Liberty, *Liberty University chooses to distribute 100% of CARES Act funds to students* (July 1, 2020), available at http://www.liberty.edu/news/2020/07/10/liberty-university-chooses-to-distribute-100-percent-of-cares-act-funds-to-students/. ("July 1, 2020 Statement").

[38] The rest of the statement continued, "We also know that many students and their families are struggling right now with job loss and other pandemic-related expenses. These emergency grants help students address their financial challenges and help them plan for their futures."

19

to ignore that Liberty *could have*, and in fact, *did pay* them thousands of Institutional Portion-CARES Act funds, merely because they believe Liberty should have had clearer messaging with its payment. Since Liberty's payment of the Institutional Portion of the CARES Act funds is highly relevant and substantially compensated Plaintiffs for asserted financial injuries, the Court will consider such payments in assessing whether Plaintiffs have shown they suffered (and continue to suffer) an injury-in-fact.[39]

In one last maneuver to claim they were injured despite Liberty's payments exceeding their total financial injuries, Plaintiffs argue that the Court should ignore the $1,000 housing credits and rollover meal plan swipes that Liberty gave to named Plaintiffs. Dkt. 99 at 7–8. In Plaintiffs' view, "a credit to the [Plaintiffs'] account of the full amount sought did not make [them] whole," because the credits came with "requirements and stipulations attached." *Id.* at 8. Further, Plaintiffs argue, because they "were not refunded to their *method of payments* … they meet their burden to show injury-in-fact." *Id.* (emphasis added) Plaintiffs' point is unsupported by the record and elides traditional principles regarding standing and mootness.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation marks omitted). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way," and the injury must be "concrete," i.e., "real, and not abstract." *Id.* at 339–40.

---

[39] Plaintiffs further argue that the Court should not consider any payments from the HEERF II tranche of funds in its standing/mootness analysis. Liberty also has not sought to include the HEERF II payments into its credits to offset the named Plaintiffs' prorated fees. Dkt. 99 at 4–5; Cooper Decl. ¶¶ 42–48. Accordingly, the Court need not consider their impact, if any, on the standing inquiry.

Because Plaintiffs C and D were in student housing in the Spring 2020 semester, Liberty gave them each—in fact, gave 5,430 students—a $1,000 credit. Cooper Decl. ¶ 25. There is no dispute about that. Nor is there any dispute that this credit could be applied to "any of their Fall 2020 semester charges (e.g., room, board, tuition, and fees)." Cooper Decl. ¶¶ 23–24. And for students who graduated in Spring 2020, they would receive a refund if the housing credit left a positive balance on their account. *Id.* ¶ 24. Students C and D received the $1,000 credits, and they received them in a timely manner. Student C Dep. at 102:7–21; Student D Dep. at 95:20–22. There is no argument that *their* credits went unused or were applied against expenses which they did not want or need. Hr'g Tr. at 21–30; Dkt. 99 at 7–8. Rather, Plaintiffs' arguments challenging the availability of the credit appear to relate to *other* potential prospective members of the class—not any of the *named Plaintiffs*.[40] But the court must "analyze standing based on the allegations of personal injury made by the named plaintiffs," and not other members of the prospective class. *Baehr*, 953 F.3d at 252. And while the credit on its own may not have made the Plaintiffs "whole," *see* Dkt. 99 at 8, it certainly *contributed* to making them whole alongside the other payments previously mentioned.

---

[40] Plaintiffs try to identify several scenarios when they say the credits were insufficient. For instance, they write that, "for any student who is not graduating in the 2020 class, the credit is not available if they choose not to return to Liberty University for the Fall 2020 semester." Am. Compl. ¶ 48; Dkt. 99 at 8. They also complain that the "credit is only available if students made an affirmative decision not to return to their on-campus residence halls and filled out a form informing the University by March 28, 2020," and that, "[o]n information and belief, many students missed the deadline because it was not clearly communicated or because Liberty did not provide adequate time and information to make an informed decision." Am. Compl. ¶ 48.

These scenarios do not describe the named Plaintiffs' circumstances. Student C, graduated in the Spring 2020 semester and received the $1,000 credit. Student C Dep. at 14:18–15:12, 102:7–21. Student D continued her enrollment, testifying that she was on track to graduate in 2023, and she also received the $1,000 credit. Student D Dep. at 11:7–12, 32:8–11, 95:20–22.

Plaintiffs liken this case to *Rothman*, where the district court held that a named plaintiff had established an injury in fact on account of the defendant gym's refusal to refund membership dues but offered him a dues credit instead. *See Rothman v. Equinox Holdings, Inc.*, No. 2:20-cv-9760, at *7–8 (C.D. Cal. Apr. 27, 2021); Dkt. 99 at 8. The facts of that case are very different. In *Rothman*, the plaintiff sued for "false and misleading misrepresentations that members *would receive monetary refunds of any prepaid membership dues for periods during which the Equinox clubs are closed.*" *Id.* at *1 (emphasis added).[41] Yet, when the gym closed, it offered the plaintiff dues credits, despite its representations "that he would automatically receive a refund if his Equinox club closed." *Id.* at *7. Given that the plaintiff in *Rothman* claimed the defendant made specific misrepresentations concerning "the method of payments" to reimburse him, *see* Dkt. 99 at 8, it is unsurprising that a defendant's failure to follow through with a specific "method of payment" could carry particular weight in the injury-in-fact analysis in that case. And, while Plaintiffs have asserted generally that families have requested refunds rather than the $1,000 statement credit,[42] Plaintiffs have neither alleged (nor provided evidence) that the named Plaintiffs, Students A, C or D (or their families for that matter), specifically sought and were denied a refund, further distinguishing *Rothman*.

---

[41] Indeed, the plaintiff in *Rothman* pointed to language from his membership agreement, specifying that "Buyer should be aware that if the club closes, *although the Club will remain legally liable to Buyer for a refund*, Buyer may risk losing his or her money if the Club is unable to meet its financial obligations to Members." *Id.* at *2 (emphasis added).

[42] Am. Compl. ¶¶ 16, 18, 20–21, 48–50, 53–56. And while Student B or their family had allegedly called Liberty to ask about a refund, and that request was denied, Student B is no longer a named plaintiff and has dropped out of the case. *Id.* ¶ 54. In addition, Plaintiffs cite one other example of a request but do not attribute it to Students A, C, or D, and it does not appear to have come from them because it concerns a request from a student who was neither returning in Fall 2020 nor graduating. *See* Dkt. 43-1 (Ex. 1); Dkt. 43 at 4 & n. 1.

In sum, Student D received credits and could have used them to pay down "any of [her] Fall 2020 semester charges," while Student C, a graduating student, received a refund. Cooper Decl. ¶¶ 23–25. No evidence suggests they would have used the money for anything else. No evidence suggests Plaintiffs suffered any financial or other harm on account of their receiving a credit rather than cash refund. The Court concludes that Plaintiffs' arguments to the contrary are hypothetical and conjectural—not reflecting the named Plaintiffs' own circumstances. Thus, Plaintiffs have shown no injury-in-fact on account of their receiving credits rather than cash refunds.[43]

3. *The Collateral Source Rule Further Demonstrates Liberty's Voluntary Payments Offset Plaintiffs' Asserted Financial Injuries*

Plaintiffs argue that "[t]he collateral source rule bars Liberty from receiving credit for distributing government stimulus funds." Dkt. 99 at 8. While Plaintiffs acknowledge that they are "unaware of any cases where the Virginia courts have addressed government benefits as a collateral source," they cite cases from other jurisdictions for the proposition that Liberty cannot "claim 'credit' for government stimulus funds." *Id.* at 10–11. As above, the Court concludes that Liberty's voluntary payments (i.e., housing credit and Institutional Portion of CARES Act funds) must be credited against its potential tort liability under the collateral source rule—a conclusion that means that Plaintiffs suffered no compensable injury.

---

[43] Plaintiffs also appear to make the cursory and undeveloped argument that Student A also suffered injury on account of the "rollover of unused meal swipes." Dkt. 99 at 7. The evidence shows that 2,013 students received meal plan credits for the unused portions of their Spring 2020 meal plans, and that Student A had 65 meal plan swipes, with an estimated value of $480.25, roll over onto her Fall 2020 meal plan. Cooper Decl. ¶¶ 27–28. Student A did not dispute that evidence, she just said she was unaware whether she had received credit for her unused meal plan swipes. Student A Dep. at 70:7–10. Nor have Plaintiffs provided any evidence to establish that Student A suffered any injury on account of her meal plan charges, especially in view of Liberty's roll-over of her unused swipes onto the next semester.

"A payment made by a tortfeasor ... to a person whom he has injured is credited against his tort liability ...." Restatement (Second) of Torts § 920A(1) (1979). In other words, "[i]f a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability." *Id.* § 920A cmt. a. But that treatment is contrasted with the "collateral source rule," which provides that payments made from *collateral sources* "are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable." *Id.* § 920A(2); *see also id.* cmt. b. Thus, if the "benefit was a gift to the plaintiff from a third party or *established for him by law*, he should not be deprived of the advantage it confers." *Id.* (emphasis added); *see also Dominion Res. Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 757 (Va. 2019) (same). Types of "collateral benefits that are not subtracted from the plaintiff's recovery" include "[s]ocial legislation benefits," such as "[s]ocial security benefits, welfare payments, [and] pensions under special retirement acts"—which are "all subject to the collateral-source rule." *Id.* cmt. c(4).[44] In other words, "[t]he law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." *Id.* cmt. b.

Under the collateral source rule, "compensation or indemnity received by a tort victim from a source collateral to the tortfeasor may not be applied as a credit against the quantum of damages the tortfeasor owes." *Acuar v. Letourneau*, 531 S.E.2d 316, 320 (Va. 2000). That is because "the injured party should be made whole by the tortfeasor, not by a combination of compensation from the tortfeasor and collateral sources." *Id.* at 323. "In other words, 'it is the tortfeasor's responsibility to compensate for all harm that he [or she] causes, not confined to the

---

[44] Insurance policies, whether maintained by the plaintiff or a third party, employment benefits, and gratuities, are benefits that are also covered by the collateral source rule and which are not subtracted from a plaintiff's recovery. Restatement (Second) of Torts § 920A(1) cmt. c.

net loss that the injured party receives." *Id.* (citing Restatement (Second) of Torts § 920A cmt. b (1977)). The "fundamental purpose of the rule" is "to prevent a tortfeasor from deriving any benefit from compensation nor indemnity that an injured party has received from a collateral source." *Acuar*, 531 S.E.2d at 322. In Virginia, the collateral source rule applies in breach of contract as well as tort cases. *See Dominion Resources*, 825 S.E.2d at 757.

"[T]he broad rule seems to be that where the plaintiff receives from the tortfeasor payments specifically to compensate him for his injury, the tortfeasor need not pay twice for the same damage, and therefore such compensation should be taken into account in fixing tort damages." *United States v. Price*, 288 F.2d 448, 449 (4th Cir. 1961). But "where the injured plaintiff's compensation comes from a 'collateral source,' it should not be offset against the sum awarded for the tort nor considered in determining that award." *Id.* In *Price*, the Fourth Circuit considered whether an annuity payable to the plaintiff under the Civil Service Retirement Act should have been deducted from the damages the plaintiff sustained when he was injured during a motor vehicle accident caused by a government employee. *Id.* The court held that Civil Service Retirement Act benefits were payments from a "comprehensive program for the retirement of government employees" that were "not designed to compensate them for particular injuries suffered." *Id.* at 450. Thus, because these payments were "essentially from a collateral source," the court held that they "under the law of Virginia should not be taken into account in computing tort damages." *Id.* at 450.

In this case, Students A, C and D were "*made whole by the tortfeasor*," and "not by a combination of compensation from the tortfeasor and collateral sources." *See Bullard v. Alfonso*, 595 S.E.2d 284, 286 (Va. 2004) (emphasis added). Liberty compensated Students A, C and D with its own money—in sums more than compensating Plaintiffs for any unused portion of

Spring 2020 semester prorated fees. And within context of the collateral source rule, that includes the Institutional Portion of CARES Act funds that Liberty paid to Students A, C and D. The CARES Act provided these funds to Liberty and other higher education institutions to broadly "cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." CARES Act § 18004(c). And unlike the Student Portion,[45] no law, regulation or contract imposed upon Liberty any obligation to disburse the Institutional Portion of these funds to students.[46] Indeed, Plaintiffs agree that Liberty need not have spent these funds on students.[47] *See* Dkt. 99 at 6 n. 6 (acknowledging that "there were many other permissible uses of the institutional portion of CARES/HEERF I funds"). For instance, Liberty could have used these funds for information technology equipment to assist in providing online courses for

---

[45] To be sure, Liberty cannot claim an offset against the *Student Portion* of the CARES Act HEERF funds. The law required Liberty to distribute that portion to students. *See* CARES Act § 18004(c). In other words, the Student Portion was a "benefit" that was "established for [the students] by law," and they "should not be deprived of the advantage that it confers." *Bullard*, 595 S.E.2d at 287 (explaining that later collateral source rule cases "have applied the rule to social security benefits," as well as in numerous other circumstances). Accordingly, Liberty's distribution of the Student Portion constitute paradigmatic payments from a collateral source that are not credited against Liberty's liability. *See* Restatement (Second) of Torts § 920A(1)-(2), cmt. c(4) (describing "social legislation benefits" as benefits that "are subject to the collateral-source rule").

[46] *Id.* § 18004(c); Cooper Decl. ¶¶ 29–33; *Alo v. Fresno City Coll.*, No. 1:22-cv-1271, 2022 WL 17722606, at *3 (E.D. Cal. Dec. 15, 2022) (explaining that "institutions of higher learning are given broad discretion as to how [HEERF] funds may be used," which funds are directed "to provide relief both to the institutions of higher learning themselves and to their students").

[47] Indeed, Plaintiffs further acknowledge that Liberty could have reimbursed students for the fees at issue from its own funds, and then used the Institutional Portion of the CARES Act funds to reimburse itself. *See* Dkt. 99 at 6 (acknowledging that "Liberty *could have* refunded students for the cost of fees and room and board, and then reimbursed itself from the institutional portion of the CARES [Act] funds"). Rather, they simply contend "that's not what happened here." *Id.*

remote learning students.[48] But because Liberty had the legal right to spend the funds on the institution itself rather than disburse it to students, the fact that the funds originated from the government is immaterial. The purposes of the collateral source rule are simply not implicated where, as here, a collateral source provides the purported *tortfeasor* funds for its own use, and that entity independently decides to provide such funds to the alleged *tort victims*. *See Acuar*, 531 S.E.2d at 322. Liberty's disbursement of the Institutional Portion constituted "payment[s] made by a tortfeasor … to a person whom he has injured," which is "credited against [its] tort liability." *See* Restatement (Second) of Torts § 920A(1).

Plaintiffs argue, however, that Liberty's distribution of HEERF I funds to Students A, C and D and other students "did not actually reimburse [them] for the fees and room and board refunds that they seek in this case," because "Liberty *never* informed the students receiving those distributions that it was refunding them for anything." Dkt. 99 at 5. The Court already rejected this argument. Record evidence discloses that Liberty provided the Institutional Portion of HEERF I funds to students to compensate them for "unexpected costs" resulting from the COVID-19 pandemic, including students' inability to "*make full use of on-campus services for which they paid*." *See* July 1, 2020 Statement (emphasis added). The Press Release further described that Liberty's model for distributing HEERF I funds was based on government data of "eligible expenses under a student's cost of attendance, such as food, housing, course fees, technology, health care, and childcare." *Id.* In addition, Liberty required each student seeking CARES Act funds to sign a "Self-Certification," in which Liberty explained its decision "*to use all of its Institutional Portion for students* enrolled in the on-campus program in the spring of

---

[48] U.S. Dep't of Educ., *Higher Education Emergency Relief Fund FAQs*, https://www2.ed.gov/about/offices/list/ope/heerfinstitutionalfaqs.pdf (last visited Oct. 4, 2023) (FAQ 4).

2020 when the COVID-19 coronavirus disrupted operations." Dkt. 89-14 (emphasis added). And

of course under the CARES Act and agency guidance, Liberty *could* (but need not) use the

Institutional Portion for additional grants to students, so long as such funds were "for expenses

related to disruption of campus operations due to coronavirus (including eligible expenses under

a student's cost of attendance, such as food, housing, course materials, technology, health care,

and child care)." CARES Act § 18004(c). Where, as here, the plaintiff receives from the

tortfeasor payments to compensate her for her injury, such compensation must be taken into

account in fixing tort damages. *See Price*, 288 F.2d at 449.

    To the extent Liberty argued, however, that its "grants and scholarships" should further

be applied to reduce Plaintiffs' total damages, the Court disagrees. *See* Dkt. 89 at 18. Grants and

scholarships, even those that come from Liberty, are not payments to compensate the tort victim

for her injury, and therefore need not be considered for purposes of fixing tort damages. *See*

*Price*, 288 F.2d at 449. Liberty, however, need not rely on those payments to offset Plaintiffs'

asserted tort damages. As Table 3 demonstrates above, Liberty's voluntary payments of the

Institutional Portion and housing credits to the named Plaintiffs more than offset their asserted

damages, i.e., prorated fees for the Spring 2020 semester.

*     *     *

    Since Liberty voluntarily paid each of the named Plaintiffs, Students A, C and D amounts

from its own coffers that more than compensated them for their total asserted financial injuries

(i.e., the prorated share of their Spring 2020 fees), and did so citing their "inability to make full

use of on-campus services for which they paid," bedrock standing/mootness principles and the

collateral source rule doctrine demonstrate that Liberty has extinguished any tort liability to the

named Plaintiffs. Because Plaintiffs have not demonstrated an injury in fact and because

28

Plaintiffs' claims accordingly have become moot, the Court must not only deny Plaintiffs'

motion for class certification but also dismiss the case. *See, e.g.*, *Beatley v. Ayers*, 851 F. App'x

332, 336 (4th Cir. 2021) (unpublished per curiam) (holding that mid-litigation payment of full

amount owed mooted breach of contract claim).[49, 50]

### Motion for Class Certification

Even if their claims were cognizable, the named Plaintiffs' motion for class certification

also fails to satisfy the requirements of Rule 23(a), as well as the more stringent requirements of

Rule 23(b)(3). Accordingly, the motion for class certification fails on the merits.

1. *Standard of Review*

Rule 23(a) requires a district court to make the following determinations before any class

action may be certified:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[49] The Court need not consider Liberty's further standing challenge to the original class definition, which sought to comprise a class including "[a]ll people—whether students *or their parents or guardians*—who paid fees" to Liberty, because the named Plaintiffs have later narrowed the proposed class definition to students. *See* Dkt. 89 at 19–20 (emphasis added); Hr'g Tr. at 4–5. In view of the Court's ruling that the named Plaintiffs lack standing and that their claims have been mooted, the Court need not consider Liberty's argument that Plaintiffs also lack standing because any injury suffered was not fairly traceable to Liberty, rather than the Virginia Governor's shut-down orders and the pandemic itself. *See* Dkt. 89 at 18–19.

[50] The named Plaintiffs further argue that "the question of whether Liberty can apply government-funded stimulus relief toward the amount of damages that it owes its students is a common and predominant issue for each Class member," that "further confirm[s]" that class certification is appropriate. Dkt. 99 at 11–12. This argument misses the mark for two reasons. First, this is not just any "common defense[ ]." *Id.* at 11. Rather, Liberty has articulated why the Court lacks jurisdiction to hear this case entirely, considering that the named Plaintiffs' claims have been mooted. *See Baehr*, 953 F.3d at 252 ("The strictures of Article III standing are no less important in the context of class actions."). And second—to the extent this argument can be considered a common at all—it is only *common* insofar as it argues that whether any students suffered any injury, and the extent of such injury, requires *individualized* evidence as to credits or other financial offsets from Liberty.

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*In re: Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233–34 (4th Cir. 2021) (quoting Fed. R. Civ. P. 23(a)). The plaintiffs, as the proponents of class certification, bear the burden of establishing that certification is warranted and that the class complies with Rule 23. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 n. 6 (4th Cir. 1977) (en banc); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006).

A litigant seeking to maintain a class action "must affirmatively demonstrate his compliance with Rule 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23 provides more than a "mere pleading standard." *Id.* The party "must not only 'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350). Rule 23(b)(3), for its part, requires that "questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Supreme Court has "cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351). However, Rule 23 does not give courts "license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. Rather, questions about the merits of a case

may be considered "only to the extent … that they are relevant to determining whether the Rule

23 prerequisites for class certification are satisfied." *Id.*

2. *Rule 23(a)*

a. *Readily Identifiable*

Rule 23 contains an "implicit threshold requirement that members of a proposed class be

'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting

*Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Some other courts have described the

requirement as one of "ascertainability," but regardless, it means that "[a] class cannot be

certified unless a court can readily identify the class members in reference to objective criteria."

*EQT Prod.*, 764 F.3d at 358. To be sure, "[t]he plaintiffs need not be able to identify every class

member at the time of certification." *Id.* However, "[i]f class members are impossible to identify

without extensive and individualized fact-finding or 'mini-trials,' then a class action is

inappropriate." *Id.* (citation omitted).

Plaintiffs seek to certify a Rule 23(b)(2), (b)(3), and/or (c)(4) class composed of:

> All students who paid fees (including but not limited to campus fees, room, board,
> parking, and other fees as broadly defined herein) in connection with enrollment in
> live, on-campus classes at Liberty University for the Spring 2020 semester.

Dkt. 43 at 5.[51] Plaintiffs argue that their proposed class "consists of at least 14,000 people, is

objectively defined, and its members can be readily ascertained from Liberty's enrollment and

payment records." *Id.* at 6. Liberty, for its part, has not challenged that Plaintiffs' proposed class

is "readily identifiable." *See* Dkt. 89 at 21–28 (describing Liberty's Rule 23 challenges to the

proposed class); *see* Hr'g Tr. at 9 (Plaintiffs' counsel, noting that Liberty has not challenged "the

---

[51] Plaintiffs do not seek refunds for tuition.

definite and ascertainable nature of our proposed class," and thus, "they've waived the opposition").

The Court agrees that Plaintiffs' proposed class is readily identifiable and can be objectively and readily ascertained from Liberty's enrollment and payment records. Plaintiffs' proposed class satisfies this implicit requirement in Rule 23.

     b. *Numerosity*

Next, Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no fixed number that is sufficient, nor any "mechanical test" to determine whether the rule has been satisfied. *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978) (per curiam). Generally, a class of fewer than 20 members is not likely to be certified, "while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 234 (quoting 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021)).

Here, Plaintiffs assert that there are "at least 14,000 members" of the proposed class— being "the number of students enrolled in live, in-person classes at Liberty for the Spring 2020 semester." Dkt. 43 at 6 (citing Am. Compl. ¶ 63). Liberty also has not challenged that Plaintiffs have satisfied the numerosity requirement in Rule 23(a)(1). *See* Dkt. 89 at 21–24.[52]

Given Plaintiffs' uncontradicted assertion that their proposed class includes at least 14,000 members—being the number of students enrolled in live, in-person classes at Liberty for

---

[52] Liberty did write that Plaintiffs have "fail[ed] to satisfy *any* of the four conjunctive requirements" of Rule 23(a), including "numerosity." Dkt. 89 at 21. However, unlike Liberty's challenges to commonality, typicality, and adequacy of representation, Liberty never developed any argument challenging numerosity. *Id.* at 21–24. The Court will not come up with one for it. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.").

the Spring 2020 semester—the Court concludes that Plaintiffs amply satisfied Rule 23(a)(1)'s

numerosity requirement.

      c.   *Commonality*

Rule 23(a) also requires a plaintiff to show that "there are questions of law or fact

common to the class." Fed. R. Civ. P. 23(a)(2). Even a single common question will satisfy Rule

23(a)(2). *Dukes*, 564 U.S. at 359. However, to satisfy the rule, not just any common question will

do, because "[c]ommonality requires the plaintiff to demonstrate that the class members 'have

suffered the same injury.'" *Id.* at 349–50. Thus, plaintiffs' claims "must depend upon a common

contention" that "must be of such a nature that it is capable of class-wide resolution," meaning

"that determination of its truth or falsity will resolve an issue that is *central to the validity of

each one of the claims in one stroke*." *Id.* at 350 (emphasis added). In other words, "[w]hat

matters to class certification … is not the raising of common 'questions'—even in droves—but

rather, the capacity to generate common *answers* apt to drive the resolution of the litigation." *Id.*

By contrast, "dissimilarities within the proposed class" may impede the "generation of common

answers." *Id.*

Plaintiffs contend that common questions will drive resolution of Plaintiffs' and other

proposed class members' claims. In their view, this case "centers on Liberty's misconduct, which

was uniformly experienced by the entirety of the proposed Class"—i.e., every student "who was

enrolled for on-campus learning at Liberty for the Spring 2020 semester." Dkt. 43 at 7. They

propose numerous "factual questions that can be resolved through common information likely to

be uncovered through discovery," such as

> (1) The facts and circumstances surrounding Liberty's response to the
> COVID-19 pandemic;
>
> (2) The existence and terms of the contracts between Liberty and its students;

(3) The nature and amount of fees paid by Liberty's students for Spring 2020;

(4) The nature and extent of services provided by Liberty in Spring 2020 in exchange for the fees;

(5) Whether Liberty misrepresented that its campus remained 'open' as a pretext to retain its students' fees; and

(6) Whether Liberty wrongfully refused to refund its students' fees after they demanded reimbursement.

Dkt. 43 at 7.

Plaintiffs also argue that there are questions of law in common as well concerning "central issues of liability and damages," including whether Liberty either "breached its uniform contracts with its students" or "was unjustly enriched" by "retaining students' fees without providing the services and activities which the fees were intended to cover." *Id.* at 8.

Liberty disagrees. Liberty argues there is no commonality "because Liberty charged each student different fees depending on their academic program, course load, parking, housing, and meal plan selections." Dkt. 89 at 21. For example, Student D's FCI contract shows Liberty charged her $155 in "material" fees, but to determine whether she was owed a refund of those fees, Liberty would need to determine (1) what materials the fees covered; and (2) whether she had access to those materials during the Spring 2020 semester. *Id.* In Liberty's view, if those fees covered materials such as computer software she used after classes moved online, she could not claim those fees went unused. *Id.* at 22. Moreover, Liberty contends that even for those fees that are charged to all students (like the "student activity fee"), the amount each student pays depends upon the financial aid the student received. "Because determining both liability and damages involves distinct factual questions for each fee paid by each student," Liberty argues that "Plaintiffs cannot satisfy the commonality requirement." *Id.*

The Court agrees with Liberty. Plaintiffs have not established commonality.

Simply put, Plaintiffs have not demonstrated that they and the other proposed class members "have suffered the same injury." *See Dukes*, 564 U.S. at 349–50. Here, "dissimilarities within the proposed class" abound, materially impeding the "generation of common answers." *See id.* at 50. Plaintiffs' proposed class of all students who attended Liberty in person in the Spring 2020 semester would include students at each of its *seventeen* colleges and schools— from those in the College of Arts & Sciences to those in the School of Aeronautics, and from those in the School of Divinity to those in the School of Nursing, and all in between. Am. Compl. ¶ 23; Answer ¶ 23; Dkt. 89-13. Yet as Student C testified, "everybody paid different amounts of fees." Dkt. 89-3 at 34:17–18. And Students A, C, and D were all undergraduate students at Liberty—two apparently in the College of Arts & Sciences, and one in the Engineering School.  None were graduate students. None were students in any of the other *fifteen* colleges at Liberty.

The scope of the institution is critical, and yet Plaintiffs' attempt to represent a single, expansive class fails to appreciate its variegated scope. Fees varied wildly between colleges, programs, and courses at Liberty. In the Spring 2020 semester, Liberty charged no fewer than *645* different course fees for enrolled students—just for its undergraduate courses. Dkt. 89-13. And that is to say nothing of the additional number of course fees for graduate students. The undergraduate student fees covered "course fees," "material fees," and "online content fees," for such purposes as "technology or equipment purchases," "consumable materials," "equipment maintenance," "software licensing, " "website subscriptions," "workshop costs," "administrative costs," "assessment fees," "exam and exam certification," "travel fees," "teacher stipends," and the like. *Id.* For example, a Divinity School student enrolled in the BIBL370 course had to pay a

$500 fee for software licensing or website subscription; a School of Aeronautics student enrolled in AVIA325 incurred a ***$13,300 flight fee***; a Theater Arts student in THEA299 had a $225 fee for administrative costs; a Health Sciences student in PHED 170 had to pay ***$100 for animal care***; a School of Nursing student in NURS302 had to pay a $100 course assessment fee, and another $125 fee for course materials or equipment maintenance; and a School of Education student in SMGT497 incurred a ***$550 travel fee***.[53] The list goes on and on.

The named Plaintiffs, as undergraduates, incurred at most *five* of the *645* course-specific fees charged to undergraduate students enrolled in the Spring 2020 semester.[54] They incurred varying "online content fees" between $50 and $117. But they testified that they were not seeking a refund of the online content fees, since they would have continued to receive the benefit of those fees when they were taking classes online.[55] Student D also had to pay $45 and $110 for two "material fees"—fees about which she could remember nothing, including whether she had received the benefit of those fees, and thus would not be eligible to seek reimbursement.[56] In other words, while the named Plaintiffs collectively incurred *two* unknown course "material fees," they claim to seek reimbursement for over *six hundred* other course fees, on behalf of *thousands* of other students at *fifteen* other colleges in which they weren't enrolled at Liberty. The highly individualized nature of course fees greatly undermines Plaintiffs' showing of commonality. *See Garcia De León v. New York Univ.*, No. 21-cv-5005, 2022 WL 2237452, at *12 (S.D.N.Y. June 22, 2022) (finding no commonality because, among other

---

[53] *See, e.g.*, *id.* at 3, 12, 14 (emphases added).

[54] *See* Dkt. 89-8 (Student A, FCI); Dkt. 89-9 (Student C); Dkt. 89-10 (Student D).

[55] Dkt. 89-3 at 72:22–74:20 (Student C); Dkt. 89-4 at 64:1–15 (Student D); Dkt. 89-2 at 73:6–15 (Student A, not including online content fee among those for reimbursement).

[56] *See* Dkt. 89-4 at 69:2–70:1.

things, "many, if not most, of the proposed class members paid *different* fees in exchange for *different* programs and services").

And the variety of fees is not the only, or even the main, problem with the named Plaintiffs' attempt to show commonality. Plaintiffs also seek reimbursement for other fees, such as student health fees of $170, resident activity fees of $385, parking registration fees of $100, and room and board (which varies somewhat based on housing unit).[57] These fees might have been for standardized sums—removing the concern about variety of fees. But, whether and to what extent the named Plaintiffs and any other putative class member was actually deprived of the benefit of such services depends upon the highly individualized circumstances unique to that student—such as whether and to what extent the student *did in fact* use the service, *could have* done so, or was *unable* to do so. In other words, underlying each fee is the individualized issue, requiring individualized proof, whether and to what extent the student "lost the benefits of the services and activities for which their fees were paid." *See* Am. Compl. ¶ 1.[58] "[T]he highly individualized character the proof of injury and damages would assume," is yet another reason the proposed class is not suitable for certification. *See Windham*, 565 F.2d at 66.

For example, students on campus continued to have access to the Student Health Center (that was funded by student health fees), and those who did not return still had access to the Student Health Center, which utilized "telemedicine to provide virtual appointments." Cooper

---

[57] Dkt. 43 at 3; Dkt. 89-5 at 7 (Student A); Dkt. 89-6 at 7 (Student C); Dkt. 89-7 at 7 (Student D).

[58] Plaintiffs are incorrect to assert that "[t]he specific fees Liberty charged each student goes only to the amount of damages, not the existence of damages, and does not defeat class certification." Dkt. 99 at 12. Using their own claim language, if a student had not "lost the benefit" of the service or and activity for which any particular fee was paid, there could be no injury—no breach of contract or unjust enrichment. Necessary individualized questions concern liability as well as damages.

Decl. ¶¶ 6, 11. However, none of the named Plaintiffs attested that they tried and were unable to access the Student Health Center or received deficient health services during the Spring 2020 semester.[59] The record therefore does not appear to show any of the named Plaintiffs suffered any financial loss at all in respect of the student health fee. But even if they (or other students) were able to demonstrate that they did not have access to services covered by the student health fee, determining which members of a class "actually sought to avail themselves of services but were unable to do so is an exercise that requires making a fact-specific determination about each putative class member." *See Garcia de León*, 2022 WL 2237452, at *13. It would require the Court to "undertake a searching inquiry into what each of approximately [14,000] students did and did not do during the first months of the pandemic with respect to … student health"—circumstances under which the named Plaintiffs "cannot establish through common proof that the entire class 'suffered the same injury,' and that an issue 'central to the validity' of each putative class member's claim can be 'resolve[d] … in one stroke." *See Id.* at *13 (quoting *Walmart*, 564 U.S. at 350).

For these same reasons, Plaintiffs' argument that calculating damages here would be nothing more than a "mechanical task," ignores the broad and multifaceted scope of the proposed class. *See* Dkt. 99 at 12–13. To be sure, Liberty may have a "published, finite, list of fees," and it may be able to "pull a report showing total charges for the semester, by student." *Id.* at 13. But

---

[59] Student A Dep. at 93:14–18, 99:2–6 (testifying that she could not remember whether she used the Student Health Center or its telemedicine services in Spring 2020); *id.* at 98:20–99:1 (testifying that she was unaware whether Student Health Center remained open for those students remaining on campus); Student C at 78:7–79:2 (testifying that she may have "visited [the Student Health Center] once at the beginning of the spring," and that she believed student health services remained available after March 23, 2020); Student D at 65:4–14 (testifying that she did not know whether the Student Health Center remained open in Spring 2020, or whether it offered virtual appointments for those who left campus).

even armed with those sources of information, the Court has to consider "the highly individualized character the proof of injury and damages would assume," *Windham*, 565 F.2d at 66, concerning whether, in view of each student's specific circumstances in March 2020, that student actually "lost the benefits of the services and activities for which their fees were paid, without having those fees refunded to them." *See* Am. Compl. ¶ 1. And that same hopelessly individualized inquiry concerns not just the amount of damages, but also liability. Further still, any student's financial injury will also depend upon whether the student received awards or grants from Liberty or elsewhere, that would have offset their liability for all or part of any of the claimed fees, as indeed 95 percent of all Liberty students receive some form of financial aid. *See* Cooper Decl. ¶¶ 15, 18, 22 (describing loans, grants and scholarships).

Moreover, the record does not support Plaintiffs' assertion that Liberty's conduct "*uniformly*" affected "the *entirety* of the proposed Class"—far from it. Again, the named Plaintiffs were undergraduate students, two apparently in the College of Arts and Sciences, one in the School of Engineering. None were graduate students. And none were in any of Liberty's fifteen other colleges. Further, Plaintiffs' case is all about fees. Their attempt to center this case on "Liberty's misconduct" rather than fees is a false distinction, and one that ignores Plaintiffs' own theory of the case. *See* Am. Compl. ¶ 15 (describing Liberty's "improper conduct" as "retaining the costs and fees paid by Plaintiffs and other Class members" when it encouraged students to move off campus).

This case is similar to *Garcia De León v. New York University*, 2022 WL 2237452. There, the named plaintiff, a graduate student at NYU, filed a class action seeking—as here— *pro rata* reimbursement of fees incurred during the Spring 2020 semester. And yet, as here, "every student at NYU d[id] not pay the same amount in fees or pay fees for the same programs

39

and services"; since "NYU is made up of 18 different schools and colleges," and "NYU students pay a wide variety of different fees, depending on what schools they attend and the particular program and courses they enroll in." *Id.* at *3. In other words, "many, if not most, of the proposed class members paid *different* fees in exchange for *different* programs and services." *Id.* at *12. Indeed, "the putative class members … ha[d] little in common except that they were enrolled in the university in 2020 and paid some type of fee to some entity within NYU for some purpose." *Id.* at *12–13. The court explained that this proposed class was like the employees at Walmart who "held a multitude of different jobs, at different levels of [its] hierarchy," and had "little in common but their sex and th[e] lawsuit," which the Supreme Court concluded did not give rise to common claims, since "each such decision would have to be assessed on its own merits." *Id.* at *12–13 (citing *Walmart*, 564 U.S. at 359–60). Accordingly, the court in *Garcia de León* concluded that the plaintiff had demonstrated neither commonality nor typicality of her claims. *Id.* at *11.

The court's reasoning in *Garcia de León* is readily applicable here.[60] It illustrates that whether students were able to, or did, take advantage of the services and activities for which students paid fees, is not merely some "merits issue [that is] not appropriate for determination at

---

[60] The named Plaintiffs argued that *Garcia de León* is "not relevant here," because NYU had "conducted an extensive proactive analysis of all spring 2020 school and course-based bills that had been billed by the Bursar for the spring semester," and "issued full or *pro rata* refunds where students did not receive all or part of the services, supplies, and equipment associated with the fee." Dkt. 138 at 1–2 (quoting *Garcia de León*, 2022 WL 2237452, at *4). But the named Plaintiffs omitted the next lines of the opinion: "Whether funds were refunded varied among the different schools, colleges, programs, and courses." *Garcia de León*, 2022 WL 2237452, at *4. NYU determined that some fees should be uniformly refunded, like housing and dining, other fees, like the "registration and services fees" and "individual program-based fees," varied by program and school. *Id.* at *3–4. Far from demonstrating the decision is "not relevant," the named Plaintiffs' position only underscores the underlying rationale of that opinion that class certification is not warranted where—as here—individualized inquiry predominates questions of whether, and to what extent, any student suffered financial injury.

this stage," or a question about individualized damages. Dkt. 99 at 14. Rather, the issue underlies whether each student suffered harm, whether Liberty is liable, and to what extent. And given the highly individualized nature of that injury, Plaintiffs have not shown "that the class members have suffered the same injury," or that they have raised "common questions" capable of generating "common answers apt to drive the resolution of the litigation." *See Walmart*, 564 U.S. at 349–50.  Accordingly, this Court similarly concludes that the named Plaintiffs have not shown commonality.

        d.  *Typicality*

     Named parties can represent absent class members when "the representative parties' claims are *typical* of the claims of every class member." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality requires that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* The "essence" of the typicality requirement is the idea that "as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (citation omitted). A plaintiff's claim will not satisfy typicality if it is "so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter*, 436 F.3d at 466–67. However the named plaintiff's claim and that of absent class members need not "be perfectly identical or perfectly aligned." *Id.* at 466–67. At bottom, the representative party "may proceed to represent the class only if the plaintiff establishes that his *claims or defense* are 'typical of the *claims or defenses* of the class." *Id.* at 467 (quoting Fed. R. Civ. P. 23(a)(3)).

     The named Plaintiffs have also failed to establish that their claims "are typical of the claims of every class member," *see Deiter*, 436 F.3d at 466, for largely the same reasons as they

failed to establish requisite commonality.[61] The three named Plaintiffs are undergraduate students in it appears *two* of Liberty's *seventeen* colleges and schools. Collectively, they incurred *two* course fees (and even as to those two "material fees," Student D could not recall what they were or whether she'd gotten the benefit of them), and yet they seek to bring a class on behalf of about 14,000 students who have incurred hundreds of other course fees—indeed, as many as 645 course fees were listed for the Spring 2020 semester. The named Plaintiffs seek reimbursement of other fees, such as the student health fee, and yet none of them testified to having been deprived of student health services in any way. Similarly individualized questions concern whether and to what extent Liberty's voluntary payments (from its Institutional Portion of CARES Act funds, and housing credit), or other grants, scholarships, and awards, have covered in whole or in part such fees.

e. *Adequacy*

The Court must also consider whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). That is to say, a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. Liberty's argument in this respect is that "[a]nonymous students cannot adequately represent the class." Dkt. 89 at 23. Liberty contends that the named Plaintiffs' "refusal to reveal their identities to the public makes it impossible for putative class members to ascertain the loyalties of three nameless, faceless students." *Id.*

---

[61] Notably, Plaintiffs largely collapsed their arguments concerning commonality and typicality into the same analysis. *See* Dkt. 99 at 12–15.

This argument is unpersuasive. For one, while their identities have been afforded

anonymity, the record discloses substantial information about each of the named Plaintiffs, such

as what they studied, their major, what year they were in school, whether they lived on campus

or off, etc. Indeed, Liberty filed the full transcripts for the depositions of Students A, C, and D,

redacted only as to their name and potential other identifying information. *See* Dkts. 89-2, 89-3,

89-4. There is ample basis upon which any prospective class member or other interested party

could evaluate whether the named Plaintiffs will "fairly and adequately protect the interests of

the class," notwithstanding their anonymity. Nor has there been any argument, much less any

evidence to back up, any claim that there exists a risk of "conflicts of interest between named

parties and the class they seek to represent." *See Amchem*, 521 U.S. at 625. Therefore, while the

Court has concluded that the named Plaintiffs have not shown that their proposed class should be

certified for failure to show other requirements of Rule 23(a) and Rule 23(b)(3), the Court

concludes that Liberty's argument as to adequacy does not provide additional grounds to reject

the proposed class.

3. Rule 23(b) (Predominance and Superiority)

Certification of a class under Rule 23(b)(3) requires that (1) "all of the prerequisites of

Rule 23(a) are satisfied," (2) "common questions of law or fact … predominate over any

questions affecting only individual class members," and (3) "proceeding as a class [is] superior

to other available methods of litigation." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 234

(citing *EQT Prod.*, 764 F.3d at 357). The "predominance inquiry" tests whether the proposed

class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S.

at 623. Predominance is "similar to but more stringent than the commonality requirement of Rule

23(a)." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (internal

quotation marks omitted). Factors pertinent to the Rule 23(b)(3) inquiry include: (A) the class

members' interests in individually controlling the prosecution or defense of separate actions; (B)

the extent and nature of any litigation concerning the controversy already begun by or against

class members; (C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P.

23(b)(3)(A)–(D).

Plaintiffs argue this case meets the Rule 23(b)(3) predominance and superiority

requirements. They contend that "[c]ourts routinely certify classes where, as here, litigation

centers on a single course of conduct by the defendant that is determinative of liability and is

common to all class members." Dkt. 43 at 12. Plaintiffs recognize that "the amount of damages

may differ slightly among Class members," such as depending upon who lived on and off

campus, but argue that "damages are easily identifiable and capable of calculation using a single,

common formula." *Id.* at 13. In their view, that simple damages formula is "multiplying the total

fees paid for each Class member times the percent of time remaining in the Spring 2020 semester

when campus was shutdown (about 40%)." *Id.* at 13–14. Moreover, Plaintiffs contend that a

class action is the superior procedure for managing this case. Their proposed class would include

over 14,000 members, and "[w]ithout a representative, aggregate action, thousands of students

likely will be unable to seek relief, because the costs of litigation are far greater than the relief

potentially available to them." *Id.* at 14.

Liberty contends, by contrast, that "[c]ommon issues do not predominate here because

establishing whether any student suffered an injury, and if so, what damages that student

suffered, requires each student to present individualized evidence regarding their fees and credits

for the Spring 2020 semester." Dkt. 89 at 25. That "fact-intensive inquiry" would include

44

identifying the amount and nature of each student's specific fees; tracing funding, financial aid, and other scholarships to sources that offset fee payments; "determine[ing], as to each student, which fees and associated services were rendered 'unusable' as a result of the pandemic"; and assessing whether Liberty's credits and CARES Act funds exceeded the prorated fee total. *Id.* Similarly, Liberty argues that "individualized damages calculations render the class unmanageable," and would result in "thousands of mini-trials," and as a result, proceeding as a class is not superior to other methods of adjudication. *Id.* at 25–26.

The Court has already concluded that the named Plaintiffs have failed to establish commonality and typicality. The Court similarly concludes that the named Plaintiffs have established neither the predominance nor superiority requirements of Rule 23(b)(3).

The named Plaintiffs argue that "[t]here is no need to look at individual services and activities and whether individual students used them or could have used them." Dkt. 99 at 17. In their view, "[o]nce classes were moved online, there was no reason to go to campus, so students necessarily did not get the value that they paid for." *Id.* Thus, "damages are easily identifiable and capable of calculation using a single, common formula," specifically "multiplying the total fees paid for each Class member times the percent of time remaining in the Spring 2020 semester when campus was shut[ ] down (about 40%)." Dkt. 43 at 13–14. To be sure, it is a simple formula—for some other case. But under the named Plaintiffs' own theory of *this* case, it is impossible to lump together 14,000 students who were charged hundreds of different fees, into one group and just claim refunds for everything.

As described above, there were at least *645 course fees* (for undergraduate courses alone) for the Spring 2020 semester, covering all range of services, programs, or costs. Just as an example (among hundreds), if a student had already received the materials accompanying the

"material fees," such as art supplies, they likely would not have "lost the benefits of the services and activities" for which the fee was paid, *see* Am. Compl. ¶ 1; *Garcia de León*, 2022 WL 2237452, at \*12 (noting that "Plaintiff has not indicated that she returned the art supplies for which she paid a \$30 fee to NYU, which calls into question whether she should be entitled to a refund of that fee"). The same goes for computer program or other subscription fees. As above, even relatively standardized fees like the student health fee require inquiry into whether a student was denied any access to student health services—and none of these named Plaintiffs testified that they did not receive student health services they paid for. The same goes for room and board. 2,284 students remained on campus after classes moved online; 1,536 stayed through graduation.[62] Those staying through graduation presumably would have no colorable claim to room and board refunds—after all, they continued to enjoy the benefits and services of (room and board) that they paid for, for the duration of the semester. *See* Am. Compl. ¶ 1. Others stayed for some period after spring break 2020, but left before the end of the semester. Others left right after spring break when Plaintiffs claim campus was "effectively" shut down. It belies reality to assert—as Plaintiffs do—that these classes of students were comparably denied the benefit of their room and board. The effect of the asserted injury (alleged deprivation of activities and services) was not felt uniformly among those who paid for any of these hundreds of fees—far from it. Rather, it depended upon each student's individual educational, financial, and other circumstances that semester.

The named Plaintiffs contend that this case at most reflects individualized issues of damages, which, alone, generally would not suffice to defeat class certification. Dkt. 99 at 16; *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427–28 (4th Cir. 2003) ("Rule 23 contains no

---

[62] Cooper Decl. ¶ 9.

suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification."). Not so. There are two remaining claims: breach of contract and unjust enrichment. The elements of breach of contract are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Student A v. Liberty Univ., Inc.*, 602 F. Supp. 3d 901, 909 (W.D. Va. 2022) (quoting *MCR Fed., LLC v. JB&A, Inc.*, 808 S.E.2d 186, 195 (Va. 2017)). Individualized inquiry with respect to fees is necessary for, not just damages, but at minimum the second and third elements of the breach of contract claim (i.e., *breach* and damages). *Id.* at 910 (element of breach requires consideration of whether "Liberty failed to fulfill its end of the bargain to provide such services or activities" for which the students "paid such fees"). And even the first element will require individualized inquiry. To be sure, while students' FCI contracts contain certain uniform language, the specific obligations owed by Liberty, any professor or third party as to any fee will vary by student. *See* Cooper Decl. ¶¶ 16–18; Dkt. 89-8 at 2, 24.

So too with respect to the unjust enrichment claim. To succeed on that claim, the named Plaintiffs must ultimately show "(1) a plaintiff 'conferred a benefit' on a defendant; (2) the defendant 'knew of the benefit and should reasonably have expected to repay' the plaintiff; and (3) the defendant 'accepted or retained the benefit without paying for its value.'" *See id.* at 912 (quoting *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 338, 341 (Va. 2020). And notwithstanding the payment of fees for various services and activities, whether Liberty "should reasonably have been expected to pay those fees back," and whether Liberty "accepted the benefit (the fees) without providing the accompanying services or reimbursing the fees," are elements of that claim that similarly require individualized inquiries. *See id.*

The named Plaintiffs are incorrect to argue that the only individualized evidence would concern damages. *See* Dkt. 99 at 16–18. And, even if that contention was true, "individualized damage determinations cut against class certification under Rule 23(b)(3)." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). Claims for damages that are too "dependent upon consideration of the unique circumstances pertinent to each class member"—as here—are not "natural candidate[s] for class-wide resolution." *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 343 (4th Cir. 1998). But as described above, unlike the cases the named Plaintiffs cite, it is not only the damages determinations that require individualized inquiry here. Rather, under the named Plaintiffs' own theory of the case, whether any student at Liberty in the Spring 2020 semester suffered *any injury*, by "los[ing] the benefits of services and activities for which their fees were paid," *see* Am. Compl. ¶ 1, and whether Liberty was liable for any such injury, depends upon the individualized facts of each student's financial situation and other circumstances during that semester. Here, "the highly individualized character the proof of injury and damages would assume," undermine any showing of predominance and superiority. *See Windham*, 565 F.2d at 66.

In addition, as Liberty has argued, individualized inquiries concerning whether "scholarships, grants and other sources," or Liberty's housing credit and CARES Act payments, "zeroed out or exceeded the prorated fee total," are further required to determine whether each student in fact had to pay for any fees sought—a necessary (but not sufficient) predicate for any injury, liability and damages. *See* Dkt. 89 at 25. Plaintiffs heavily rely upon a case in which the district court granted class certification on a breach of contract claim for a class of students seeking reimbursement for campus fees. *See Little v. Grand Canyon Univ.*, No. 20-cv-795, 2022 WL 266726, at *7 (D. Ariz. Jan. 28, 2022); Dkt. 135 at 2–4. Notably, that court *denied*

certification on an unjust enrichment claim, explaining that "[c]ommon questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualize facts." *Id.* (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009)). And, although the *Little* court did certify a class on the breach of contract claim, the Seventh Circuit has recently cautioned against summarily following that court's conclusion without conducting the requisite "rigorous analysis" into whether certification is warranted, including the university's arguments that "[the plaintiff's] breach of contract claim would lead to many individual questions regarding damages." *See Eddlemon v. Bradley Univ.*, 65 F.4th 355, 340 (7th Cir. 2023) (vacating and remanding district court's certification order; finding reversible error as to findings that named plaintiffs had established commonality and predominance of proposed class seeking refunds for prorated tuition and activity fee). Here, such an analysis demonstrates that common issues do not predominate. Just the opposite.

Plaintiffs further argue that a class action is the superior procedure for managing this class. Dkt. 43 at 14–15. In their view, without a representative aggregate action, "thousands of students likely will be unable to seek relief, because the costs of litigation are far greater than the relief potentially available to them." *Id.* at 14. The Court is not unmindful of this concern that the financial incentives for individual students to seek relief, compared with the costs attendant to litigation, may dissuade some from individually seeking relief. *See Amchem*, 521 U.S. at 617 (explaining that class actions are meant "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). But Plaintiffs' cited authority that certifying a class is the superior procedure does not account for the massive manageability problems inherent in this case. *See Lee v. JNL Constr. Servs.*, No. 17-cv-2765, 2019 WL 3869412, at *5 (D. Md. Aug. 16, 2019) (finding superiority met and certifying

FLSA class of "potential 87 class members"); Dkt. 43 at 14 (citing *Lee v. JNL Constr. Servs.*). In particular, "superiority is not satisfied because the potential efficiencies of a class action are not realized where"—as here—"an individual assessment of each putative class members claims must be made." *See Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12-cv-97, 2016 WL 4611570, at *12 (E.D. Va. Sept. 2, 2016) (cleaned up); *accord Broussard*, 155 F.3d at 343–44 (explaining that while "a class action may be the most economical and efficient means of litigation in many circumstances," that fact cannot support certifying a class where "the class claims were based on widely divergent facts," and "without any necessary connection to the merits of each individual claim").

For these reasons, the Court concludes that the named Plaintiffs have not demonstrated either that "common questions of law or fact … predominate over any questions affecting only individual class members," or that "proceeding as a class [is] superior to other available methods of litigation." *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 234 (citing *EQT Prod.*, 764 F.3d at 357).

### Rule 23(b)(2)

Plaintiffs also briefly argued that certification of a declaratory and injunctive relief class is appropriate under Rule 23(b)(2). Dkt. 43 at 15–16. Under that rule, a class may be certified if the Rule 23(a) requirements are met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs' attempt to invoke this rule fails. "Rule 23(b)(2) does not cover cases where the primary claim is for damages, but rather is only applicable where the relief sought is …

predominantly injunctive or declaratory." *Thorn*, 445 F.3d at 329 (internal quotation marks

omitted); *see also Zimmerman v. Bell*, 800 F.2d 389–90 (4th Cir. 1986) (holding that Rule

23(b)(2) does not apply where the proposed class seeks "essentially monetary relief"). The only

injunctive relief sought here is nominal at best: that the Court "enjoin[ ] Defendant from

*retaining* the pro-rated, unused portion of monies paid for fees." Am. Compl. at p. 24 (emphasis

added). And the only declaratory relief sought as to the merits of Plaintiffs' pending claims is a

declaration "that Defendant has wrongfully kept the monies paid for fees." *Id.* at p. 23. Because

Plaintiffs' entire case is about seeking fee refunds, not seeking any declaratory or injunctive

relief, and given the nature of Plaintiffs' claims, the Court holds that certification under Rule

23(b)(2) is inappropriate.

## Rule 23(c)(4)

Finally, the named Plaintiffs argued that, in the alternative, the Court should grant class

certification under Rule 23(c)(4). Dkt.  43 at 16–17. In their view, even if common questions do

not predominate, they contend that "Rule 23(c)(4) grants this Court the discretion to proceed

with class adjudication of the key issues establishing Liberty's liability." *Id.* at 17. And, they

argue, "[t]he only issues that will require separate inquiry … relate to damages." *Id.* Because

"[a]ny follow-on proceedings to determine damages would be far more efficient than re-trying

the core liability questions hundreds or thousands of times," the named Plaintiffs argue that if

this Court determines that certification under Rule 23(b) is inappropriate, it should grant class

certification under Rule 23(c)(4). *Id.* The named Plaintiffs' argument fares no better in this

respect.

Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained

as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The Fourth Circuit

has "held that this rule allows for certification of a class as to a particular cause of action, even where a lawsuit as a whole would not satisfy Rule 23(b)'s predominance requirement." *In re Marriot Int'l, Inc.*, 78 F.4th 677, 688 (4th Cir. 2023) (citing *Gunnells*, 348 F.3d at 439–45). The named Plaintiffs' argument to certify an issues class, however, incorporates the same flaws as their arguments to certify a class under Rule 23(b)—namely, the misperception that individual differences among students are immaterial to class-wide resolution of the claims. In other words, this argument "cleave[s] off individualized questions of liability, as well as damages, for separate individual trials, diminishing the efficiency gains of the class proceedings." *See In re Marriott Int'l, Inc.*, 78 F.4th at 689. And while an issue class may somewhat address the "incentive problem" that individual plaintiffs may have enough at stake to justify individual litigation, "that benefit, too, is diminished by issue certifications where the remaining individualized issues will also require significant resources." *See id.* (cleaned up). For the same reasons that superiority is not satisfied with respect to the Rule 23(b) class, the Court concludes that superiority also "comes into play to defeat issue certification" here. *See id.*

The Court further notes that the named Plaintiffs did not seek to narrow the potential class members to those with more uniform circumstances, such as those within an individual school in Liberty, and the Court will not attempt to devise subclasses that might pass muster under Rule 23 or Rule 23(c)(4), where the named Plaintiffs themselves have not sought to do so. *See Garcia de León*, 2022 WL 2237452, at *2–3, 11 (in concluding that there is no commonality, explaining that "[a]t most, Plaintiff might (but does not) argue that her injury shares common features with other students at the Silver School," i.e., NYU's School of Social Work, rather than NYU and its 18 "different schools and colleges" in its entirety).

*        *        *

Because the Court concludes that the named Plaintiffs have not demonstrated commonality, typicality, predominance, or superiority, the Court must deny their motion for class certification.

## <u>Conclusion</u>

The Court has determined that the named Plaintiffs have not suffered an injury-in-fact and their claims have been mooted. The Court has further concluded that the named Plaintiffs have not satisfied the requirements for class certification under Rule 23(a) or Rule 23(b)(3)—or Rule 23(b)(2) or (c)(4) for that matter. Accordingly, in an accompanying Order, to follow, the Court will deny the named Plaintiffs' motion for class certification and dismiss the Amended Complaint.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this <u>10th</u> day of October, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE